**Byron PAREDES–URRESTARAZU,**
Petitioner,

v.

**U.S. IMMIGRATION AND NATURAL-IZATION SERVICE, Respondent.**

No. 91–70143.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 9, 1993.

Opinion Filed April 25, 1994.

Opinion Withdrawn Aug. 23, 1994.

Decided Aug. 23, 1994.

---

Vera A. Wisz, Los Angeles, CA, for petitioner.

Francesco Isgro, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: TANG, D.W. NELSON, and LEAVY, Circuit Judges.

## ORDER

The opinion filed April 25, 1994, slip op. 3973, and appearing at 22 F.3d 909 (9th Cir.1994), is withdrawn.

The petition for rehearing, filed May 24, 1994, is denied.

## OPINION

D.W. Nelson, Circuit Judge:

Byron Paredes–Urrestarazu ("Petitioner") petitions this court for review of a decision of the Board of Immigration Appeals ("BIA" or "Board") that found him deportable under section 241(a)(2)(A)(ii) of the Immigration and Nationality Act ("INA" or "Act"), 8 U.S.C. 1251(a)(2)(A)(ii), and denied him discretionary relief from deportation under section 212(c), 8 U.S.C. § 1182(c). Petitioner contends that the Board erred as a matter of law by failing to adhere to the provisions of the California pretrial diversion program, Cal.Penal Code §§ 1000–1000.5 (Deering 1983 & Supp.1993), in determining whether he warranted section 212(c) relief. In addition, Petitioner maintains that the BIA abused its discretion by erroneously determining that he failed to establish rehabilitation and that he gave false testimony. We have jurisdiction pursuant to 8 U.S.C. § 1105a, and now affirm.

## I. Factual and Procedural Background

Petitioner is a native and citizen of Guatemala. In 1970, at the age of 12, he was admitted into the United States as a lawful permanent resident. In 1979, Petitioner was convicted of five counts of armed robbery stemming from gang-related acts committed on May 4 and August 24, 1979, and served three years of a five year sentence prior to release on parole. On February 4, 1983, the day after Petitioner's incarceration ended, the Immigration and Naturalization Service ("INS" or "Service") commenced deportation proceedings against him, contending that he was deportable under section 241(a)(2)(A)(ii) of the Act for having been convicted of two crimes involving moral turpitude. Although Petitioner was scheduled to appear before an immigration judge in San Francisco on Feb-

ruary 10, 1983, he requested and received a transfer of his case to Los Angeles.

Subsequently, in 1986, Petitioner was arrested and charged with possession of narcotics. Instead of standing trial for the offense, Petitioner entered a pretrial diversion program pursuant to California Penal Code section 1000.2.[1] In 1987, after successful completion of his probation, the charges against Petitioner were dismissed in accordance with the provisions of the program. *See* Cal.Penal Code § 1000.3 (Deering 1983).

The deportation hearing was held on July 13, 1988. During the questioning, counsel for the INS asked Petitioner's wife if Petitioner had been arrested in 1986. Petitioner's counsel objected, contending that section 1000.5 of the California Penal Code, Cal.Penal Code § 1000.5 (Deering 1983) ("section 1000.5"),[2] prevented either Petitioner or his wife from having to answer this question. *See* Admin.Rec. at 82–86. The immigration judge ("IJ") overruled the objection, and Petitioner eventually testified as to the details and circumstances of the arrest. Petitioner's counsel also objected on the same ground to the introduction into evidence of the FBI "rap sheet" that indicated the fact of the 1986 arrest. The IJ, however, permitted its introduction. *Id.* at 119–20.

Based on the armed robbery convictions, the immigration judge found Petitioner deportable as charged. Turning to the request for section 212(c) relief, the IJ concluded that Petitioner's seventeen year presence in the country, in addition to the fact that his wife, child, and numerous relatives either were United States citizens or lawful permanent residents, indicated that he had "outstanding equities." Admin.Rec. at 49. However, the IJ found these positive factors outweighed by numerous others that demonstrated his "bad character and undesirability as a permanent resident in the United States." *Id.* In addition to Petitioner's prior convictions, abuse of PCP, lack of evidence of community involvement, and apparent false testimony regarding his military service, the IJ also considered the facts surrounding Petitioner's 1986 arrest, including that Petitioner directed to the arresting officers who attempted a body search an "obscenity [that] indicate[d] his disrespect for enforcement officers." *Id.*

Petitioner appealed the IJ's decision to the BIA, which affirmed. Engaging in a *de novo* review of the record, the BIA agreed with the IJ that Petitioner exhibited "unusual and outstanding" equities. Admin.Rec. at 10. However, like the IJ, the Board concluded that these equities were "outweigh[ed by] very serious adverse" factors. *Id.* The Board emphasized the gang-related 1979 armed robberies, Petitioner's 1979 general court-martial and dishonorable discharge from the military, his false testimony concerning his military service, and his past drug abuse.

The Board also considered explicitly the 1986 arrest, maintaining that it "demonstrate[d] [Petitioner's] continuing disrespect for the law and probable continued use of drugs." Admin.Rec. at 10. Rejecting Petitioner's argument that section 1000.5 permitted him to refuse to acknowledge his arrest and prohibited the INS from introducing the

---

1. In California, a defendant accused of certain drug violations who has no prior "conviction for any offense involving controlled substances prior to the alleged commission" of the charged offenses may, under certain circumstances, be eligible for pretrial diversion. Cal.Penal Code §§ 1000–1000.2 (Deering 1982 & Supp.1993). If the court determines that the defendant would benefit from diversion, the accused is "referred for education, treatment, or rehabilitation" for a period ranging between 6 months and 2 years. *Id.* § 1000.2. If the accused successfully completes the diversion program, "at the end of the period of diversion, the criminal charges shall be dismissed." *Id.* § 1000.3. If not, criminal proceedings resume. *Id.*

2. Section 1000.5 provides:

Any record filed with the Department of Justice shall indicate the disposition in those cases diverted pursuant to this chapter. Upon successful completion of a diversion program the arrest upon which the diversion was based shall be deemed to have never occurred. The divertee may indicate in response to any question concerning his prior criminal record that he was not arrested or diverted for such an offense. A record pertaining to an arrest resulting in successful completion of a diversion program shall not, without the divertee's consent, be used in any way which could result in the denial of any employment, benefit, license, or certificate.

Cal.Penal Code § 1000.5 (Deering 1983).

FBI report, the Board concluded that "the immigration judge correctly considered the respondent's 1986 arrest and completion of a diversion program.... [Petitioner's] acts had legal consequences and can be properly considered by this Board in determining bad character, disrespect for the law and rehabilitation." *Id.* at 9. Finally, the Board determined that, although Petitioner had "shown on the surface a semblance of family life and employment" the evidence did not establish rehabilitation which, the Board asserted, "is an important element of [section] 212(c) relief." [3]

Petitioner now contends that the BIA's consideration of his 1986 arrest constituted reversible error because it violated California Penal Code section 1000.5. That provision expressly permits an accused who successfully completes the pretrial diversion program to indicate in response to questioning related to an offense that "he was not arrested or diverted for such [an] offense," and prohibits, without the divertee's consent, the use of "a record" of that arrest to deny the divertee "any ... benefit." Cal.Penal Code § 1000.5 (Deering 1983). Petitioner also maintains that the BIA abused its discretion in denying him section 212(c) relief by erroneously determining that he gave false testimony and did not adequately demonstrate rehabilitation.[4] We find these arguments without merit.

## II. The Elements of Section 212(c) Relief and the Standard of Review

■ Section 212(c) permits the Attorney General to grant discretionary relief from deportation or exclusion to lawful permanent residents who meet the statute's seven year residency requirement. *See* 8 U.S.C. § 1182(c) (1988); *Lepe–Guitron v. INS,* 16 F.3d 1021, 1023 (9th Cir.1994) (noting that

section 212(c), despite its reference only to the exclusion of aliens, applies to deportation proceedings). As we explained in *Yepes–Prado v. INS,* 10 F.3d 1363 (9th Cir.1993):

> In exercising his responsibility, an IJ must determine whether to grant section 212(c) relief based on all the facts and circumstances of a particular case, taking into account the social and humane considerations presented in an applicant's favor and balancing them against the adverse factors that evidence the applicant's undesirability as a permanent resident. *In re Edwards,* Interim Dec[.] No. 3134, 1990 WL 385757, 1990 BIA [LEXIS 8, at] *9.

> The BIA has enumerated several factors to be considered in determining whether or not to grant a section 212(c) petition. Favorable considerations include: 1) family ties within the United States; 2) residence of long duration in this country (particularly when residence began at a young age); 3) hardship to the petitioner or petitioner's family if relief is not guaranteed; 4) service in the United States armed forces; 5) a history of employment; 6) the existence of business or property ties; 7) evidence of value and service to the community; 8) proof of rehabilitation if a criminal record exists; 9) other evidence attesting to good character. *Id.* 1990 WL 385757, 1990 BIA LEXIS 8, at 10–11. To be weighed against these factors are: 1) the nature and underlying circumstances of the exclusion or deportation ground at issue; 2) additional violations of the immigration laws; 3) the existence, seriousness, and recency of any criminal record; 4) other evidence of bad character or the undesirability of the applicant as a permanent resident. *Id.* 1990 WL 385757, 1990 BIA LEXIS 8, at 11.

*Yepes–Prado,* 10 F.3d at 1365–66 (footnotes omitted). In this weighing process, "[a]s the

---

**3.** Board Member Dunne dissented as to the denial of § 212(c) relief. She contended that "section 1000.5 of the California Penal Code provides a basis for this court to refuse to consider Petitioner's 1986 arrest against him." Admin.Rec. at 13 (Dunne, concurring in part and dissenting in part). In addition, she found that "the record as a whole militates in favor of concluding" that Petitioner demonstrated rehabilitation. *Id.* at 14.

Accordingly, Board Member Dunne would have granted Petitioner § 212(c) relief. *Id.*

**4.** In addition to affirming the IJ's denial of § 212(c) relief, the Board agreed with the IJ's determination of deportability and denied Petitioner's motion to remand to permit an application for relief under § 212(h). Petitioner does not challenge these rulings in this action.

negative factors grow more serious, it becomes incumbent upon the alien to introduce additional offsetting favorable evidence, which in some cases may have to involve unusual or outstanding equities." *In re Roberts*, Interim Dec. No. 3148, 1991 WL 353515, 1991 BIA LEXIS 9, at *5. A single serious crime or a pattern of misconduct can trigger a need to make this showing, *id.*, and to warrant a favorable exercise of discretion, an applicant with a criminal record "will ordinarily be required to present evidence of rehabilitation," *id.* 1991 WL 353515, 1991 BIA LEXIS 9, at *6. However, "there are cases in which the adverse considerations are so serious that a favorable exercise [of discretion] is not warranted even in the face of unusual or outstanding equities." *Yepes–Prado*, 10 F.3d at 1366.

 This court reviews the agency's factual conclusions under the substantial evidence standard, *see id.* (citing *Martinez v. INS*, 970 F.2d 973, 974 (1st Cir.1992)), and the balancing of the equities for abuse of discretion, *id.* (citing *Vargas v. INS*, 831 F.2d 906, 908 (9th Cir.1987)). The agency must state its reasons for its decision and demonstrate that it considered all appropriate factors. *Id.* Questions of law, "such as whether the BIA applied the appropriate legal standard," are reviewed *de novo*. *Arteaga v. INS*, 836 F.2d 1227, 1228 (9th Cir.1988). When appropriate, however, we apply the principles of deference to an agency's construction of a statute that it is charged with administering as articulated in *Chevron USA Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny. *See, e.g., Hernandez–Vivas v. INS*, 23 F.3d 1557, 1560 (9th Cir.1994); *Kahn v. INS*, 20 F.3d 960, 962 (9th Cir.1994) (per curiam); *Mendoza v. INS*, 16 F.3d 335, 337 (9th Cir.1994). Finally, in cases such as this, in which the Board has exercised its power to conduct a *de novo*

review of the IJ's decision, we review only the decision of the BIA. *See Yepes–Prado*, 10 F.3d at 1366–67.

## III. Discussion

### A. *The BIA did not Err in Refusing to Adhere to Section 1000.5 in Performing its Section 212(c) Analysis*

Petitioner raises two arguments in support of his claim that the Board erred by not following section 1000.5. First, Petitioner contends that the Board's failure to give effect to that provision was an impermissible application of section 212(c). Second, he appears to argue that the Board's refusal to adhere to section 1000.5 was an unexplained departure from prior practice. We reject both arguments.

### 1. *Does Section 212(c) Require the Board to Follow the Suppression Provisions of the California Diversion Scheme?*

 The federal government possesses plenary power over immigration. *See, e.g., Toll v. Moreno*, 458 U.S. 1, 11–13, 102 S.Ct. 2977, 2982–84, 73 L.Ed.2d 563 (1982); *Kleindienst v. Mandel*, 408 U.S. 753, 766–67, 92 S.Ct. 2576, 2583–84, 33 L.Ed.2d 683 (1972). And, the interpretation of the provisions of the INA is a question of federal law. *See, e.g., Morales–Alvarado v. INS*, 655 F.2d 172, 174 (9th Cir.1981) (holding that "conviction" within the meaning of the INA is "a matter of federal immigration law, not a matter of state law"); *accord Kahn*, 20 F.3d at 962; *de la Cruz–Martinez v. INS*, 404 F.2d 1198, 1200 (9th Cir.1968), *cert. denied*, 394 U.S. 955, 89 S.Ct. 1291, 22 L.Ed.2d 491 (1969). Accordingly, the precise question we must answer is whether Congress intended that the BIA, in exercising its discretion under section 212(c) of the INA, must give effect to a state diversion regime such as California's.[5]

---

5. We assume for the purposes of this discussion that the initial questioning of Petitioner's wife would constitute a violation of section 1000.5, as would the introduction of the FBI rap sheet. *Cf. Unzueta v. Ocean View Sch. Dist.*, 6 Cal.App.4th 1689, 1696, 8 Cal.Rptr.2d 614 (1992) ("The language of Penal Code section 1000.5 is extraordinary and compelling. It demonstrates the breadth of the Legislature's underlying remedial

purpose. 'We determine that the use of the words "shall not be used" and "in any way," in referring to the record of arrest of a successful divertee, is indicative of an intent by the Legislature that the protection of section 1000.5 be given the broadest application.'" (quoting *B.W. v. Board of Medical Quality Assurance*, 169 Cal. App.3d 219, 232, 215 Cal.Rptr. 130 (1985))). *But cf. Sandoval v. State Personnel Bd.*, 225 Cal.

We have found no published decision by the Board or the federal courts that addresses this question. However, a review of decisions in which the BIA has exercised analogous discretionary authority indicates that the Board consistently has held the view that, absent an expression of congressional intent to the contrary, in making discretionary determinations under the Act it may consider an alien's past conduct and legal consequences flowing from that conduct *regardless* of a state's policy to the contrary. Moreover, this circuit implicitly appears to have approved the Board's analysis.

The underlying concern was recognized as early as 1943. In *In re Paoli*, 49 F.Supp. 128 (N.D.Cal.1943), the court faced the question of whether the expunging of a conviction pursuant to section 1203.4 of the California Penal Code precluded the court from considering the conviction in determining "good moral character" for the purposes of establishing eligibility for citizenship. The court concluded that:

> If the circumstances are such that a state is willing to expunge the record of a crime, this fact may be persuasive in enabling the court before which application is made for citizenship to determine whether the character of the applicant is sufficiently good to permit his admission to citizenship.... *But it would hamper the court in the exercise of its discretion in determining the important question of moral character, if it were bound to disregard entirely the original act of the applicant in committing the crime.*

*Id.* at 130–31 (emphasis added).

The Board adopted this principle in *In re Gonzalez*, 16 I. & N. Dec. 134 (BIA 1977). There, the BIA disagreed with the Third Circuit's decision in *Giambanco v. INS*, 531 F.2d 141 (3d Cir.1976). The Third Circuit had held that a state judicial recommendation against deportation pursuant to section 241(b) of the Act,[6] which prevented a conviction from serving as the basis for deportation, precluded the Board from taking that

conviction into account in determining whether the alien should receive the discretionary relief of adjustment of status. *See id.* at 147–49. Although acknowledging that *Giambanco* was binding on it for cases arising in the Third Circuit, the Board argued that:

> The Act nowhere states that the criminal activity and the conviction which resulted therefrom cannot be considered in connection with an application for discretionary relief..... [Accordingly,] *all evidence of record including that conviction and the nature of the criminal activity, could be considered in determining whether the respondent is a person of good moral character and in exercising discretion under section 244(e) of the Act. Contrary to the view expressed by the [Giambanco] court, the interpretation suggested here is the same applied in those cases in which an expungement of the conviction has been obtained.*

*Id.* at 136 (emphasis added).

In support of its position, the Board cited both *In re H—*, 6 I. & N. Dec. 619 (BIA 1955), and *Paoli*. These cases, however, were in some tension. H— appeared to approve of a prior precedent in which the Board held that "a full and unconditional pardon not only serves as a bar to deportation but also wipes out the crime insofar as discretionary relief is concerned." *In re H—*, 6 I. & N. Dec. at 626 n. 1 (citing *In re Z—*, No. E–072431 (BIA 1954)). Indeed, *H—*, and the cases that followed its reasoning, appeared to hold that an expungement pursuant to California Penal Code § 1203.4 would not preclude further inquiry by the Board only because *California* did not recognize the statute as a "full and unconditional pardon by the executive authority of the State of California." *In re D—*, 7 I. & N. Dec. 670, 673 (BIA 1958), *overruled on other grounds by In re A— F—*, 8 I. & N. Dec. 429 (BIA 1959); *see also In re H—*, 6 I. & N. Dec. at 622 (noting that section 1203.4 does not "completely obliterate the fact that the unlawful acts occur[red]" (citing *Meyer v.*

App.3d 1498, 1502, 275 Cal.Rptr. 702 (1990) (contending that reliance on an arresting officer's personal testimony concerning the fact of arrest would not be prohibited by § 1000.5).

6. This provision, codified at 8 U.S.C. § 1251(b), was repealed by the Immigration Act of 1990, Pub.L. No. 101–649, § 505, 104 Stat. 4978, 5050 (1990).

*Board of Medical Examiners,* 34 Cal.2d 62, 206 P.2d 1085 (1949)). By contrast, *Paoli,* also approved by the Board in a number of decisions, *see, e.g., In re S— R—,* 7 I. & N. Dec. 495, 499 (BIA 1957); *In re E— V—,* 5 I. & N. Dec. 194, 196 n. 4 (BIA 1953), made no distinction between the California statute and a "full and unconditional pardon," and broadly asserted that "[w]hether the offender was punished or forgiven, the act continues to exist as an indication of the character of the applicant." *In re Paoli,* 49 F.Supp. at 130–31.

Because the BIA interpreted a recommendation against deportation pursuant to section 241(b) as the equivalent of a "full and unconditional pardon," *e.g., In re D—,* 7 I. & N. Dec. at 673, under *Z—,* presumably a recommendation against deportation pursuant to section 241(b) would have demanded the result reached by the *Giambanco* court—that the recommendation against deportation *precluded* reliance on the conviction (and thus the conduct underlying it) in a discretionary determination. As the *Gonzalez* court reached the contrary conclusion, the Board clearly adopted the *Paoli* court's analysis. This conclusion is confirmed by the central concern articulated by the Board:

> Had no criminal action been instituted against the respondent, the fact of his involvement in the criminal activity could have been brought out and considered in connection with an application for discretionary relief. The court's ruling in *Giambanco* places him a position *superior* to the person who has not been convicted of his crime.

*In re Gonzalez,* 16 I. & N. Dec. at 136–37 (emphasis added).

*Gonzalez,* of course, only considered the effect of section 241(b) on an adjustment of status determination. However, the Board's reasoning as well as its broad rejection of *Giambanco,* a case which appeared to apply to *all* forms of discretionary relief,[7] suggested that the general principle that Congress did not intend for state expunging regimes to bar consideration of either past conduct or the consequences that the state attached to such conduct in a discretionary determination was applicable elsewhere. This reading of *Gonzalez* appears confirmed by *In re Seda,* 17 I. & N. Dec. 550 (BIA 1980), *overruled on other grounds by In re Ozkok,* 19 I. & N. Dec. 546 (BIA 1988), in which the Board held that, although a conviction expunged under a state expunging statute could not be considered "an admission of commission of the crime" for the purposes of barring eligibility for voluntary departure, the fact of the guilty plea properly could be considered as an "adverse factor ... in deciding whether a favorable exercise of discretion is warranted," *id.* at 554. A broad view of *Gonzalez* also was advanced by the Seventh Circuit in *Oviawe v. INS,* 853 F.2d 1428 (7th Cir.1988). There, the court took *Gonzalez* to stand for the general proposition that, as long as Congress had not excluded factors from consideration, the BIA should not be precluded from considering "*all* factors that bear on its exercise of discretion." *Id.* at 853 (emphasis in original). Adopting the BIA's reasoning, the Seventh Circuit held that it would be "anomalous" to conclude that the "BIA is foreclosed from considering adverse information to balance against positive information when weighing the equities of a situation." *Id.*

Our circuit also implicitly has accepted a broad reading of *Gonzalez.* In *Delgado–Chavez v. INS,* 765 F.2d 868 (9th Cir.1985) (per curiam), we expressly rejected *Giambanco, id.* at 869–70, and held that a prior conviction that section 241(b) precluded from serving as a basis for deportation nonetheless "may be considered as an adverse factor in deciding whether the favorable exercise of discretion is warranted," *id.* at 869 (citing *In re Seda,* 17 I. & N. Dec. 550, 554 (BIA 1980)).[8] Subsequently, we stated in *Villanueva–Franco v. INS,* 802 F.2d 327 (9th Cir.1986), that *Delgado–Chavez* stood for the proposition that the "BIA may consider [an] alien's conviction and other adverse conduct in the exercise of [its] discretion," *id.* at 330.

7. *See Gonzalez,* 16 I. & N. Dec. at 134 n. 1 (noting that it interpreted *Giambanco* as applicable to "all discretionary applications under the Act").

8. *Delgado–Chavez,* in fact, was relied upon by the Seventh Circuit in *Oviawe. See Oviawe,* 853 F.2d at 1432–33.

■ The principle underlying *Gonzalez* plainly is applicable to section 212(c). Determining whether section 212(c) relief should be awarded involves the same type of balancing of equities the Board must undertake in the discretionary determinations considered in the adjustment of status and voluntary departure contexts. *See Yepes–Prado,* 10 F.3d at 1365 (stating that section 212(c) requires the Board to examine "all the facts and circumstances of a particular case"); *In re Edwards,* 1990 WL 385757, 1990 BIA LEXIS at *10 ("The exercise of discretion in a particular [section 212(c) ] case necessarily requires consideration of all the facts and circumstances involved."); *accord In re Buscemi,* 19 I. & N. Dec. 628, 633 (BIA 1988); *cf. Campos–Granillo v. INS,* 12 F.3d 849, 852 (9th Cir.1994) (citing section 212(c) cases in discussing the factors relevant to a discretionary determination involving voluntary departure). Therefore, as long as the Board does not consider inappropriate or irrelevant factors, *see Yepes–Prado,* 10 F.3d at 1367–69; *cf. Rassano v. INS,* 492 F.2d 220, 227 (7th Cir.1974), we think that the breadth of the section 212(c) inquiry permits the Board to consider evidence of conduct that does not result in a conviction. *Cf. Parcham v. INS,* 769 F.2d 1001, 1005 (4th Cir.1985) ("Evidence of an alien's conduct, without conviction, may be considered in denying the discretionary relief of voluntary departure."), *paraphrased in Villanueva–Franco,* 802 F.2d at 330.

■ The fact of arrest, insofar as it bears upon whether an alien might have engaged in underlying conduct and insofar as facts probative of an alien's "bad character or undesirability as a permanent resident" arise from the arrest itself, plainly can have relevance in performing the analysis required by section 212(c).[9] Furthermore, we believe that to permit the California expunging regime to limit the section 212(c) inquiry by barring evidence of the fact of an alien's arrest might result in the very anomaly identified in *Gonzalez*—the arrest actually could

*improve* an alien's position: if the alien in question is not arrested, for instance, but merely stopped by the police, an account of the relevant events could be elicited from him; but if the alien instead is arrested and the California diversion regime is respected, then the INS would be precluded from questioning the alien concerning the arrest or from introducing a record of the same, with the likely outcome that the tribunal undertaking the section 212(c) determination never would learn of relevant facts.

Like the Board in *Gonzalez,* we do not think Congress intended to mandate such anomalies. And, as this circuit stated in interpreting the term "conviction" in the INA: "Deportation is a function of federal and not state law.... 'It would defeat the purposes (of federal law) if provisions of local law, dealing with rehabilitation of convicted persons, could [defeat federal policy].... We do not think Congress intended such a result.'" *de la Cruz–Martinez,* 404 F.2d at 1200 (quoting *Garcia–Gonzales v. INS,* 344 F.2d 804, 809 (9th Cir.), *cert. denied,* 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965) (alternations added)); *cf. Kahn,* 20 F.3d at 962 (holding that the BIA's conclusive adoption of state definitions of marriage was not "rationally related" to the INA's purpose of ensuring " 'a uniform federal [immigration] policy' " (quoting *Rosario v. INS,* 962 F.2d 220, 223 (2d Cir.1992))). Consequently, as long as Congress has not implicitly demanded adherence to section 1000.5, we believe that to require the Board to give effect to that provision would impair impermissibly the BIA's ability to undertake the particularized assessment that section 212(c) demands.

Here, we do not find that Congress implicitly has prohibited the INS from considering Petitioner's arrest or a record of that arrest. It is true that Congress, in what became known as the Federal First Offender Statute ("FFOS"), 21 U.S.C. § 844(b)(1), and its successor provision codified at 18 U.S.C. § 3607, has provided a mechanism very similar to the

---

9. We do not hold that the fact of an arrest *vel non always* constitutes a relevant factor. *See also infra* p. 816 & n. 15. To conclude that the

California diversion regime need not be given effect by the Board, however, only requires us to

California diversion program.[10] A first-time narcotics offender, upon a determination of guilt by the court, may have the entry of judgment of guilt withheld and may be placed on probation for up to one year. 21 U.S.C. § 844(b)(1). That provision further provides that, upon successful completion of probation, the charges will be dismissed "without court adjudication of guilt, but a nonpublic record shall be retained by the Department of Justice solely for the purpose of use by the courts in determining whether or not, in subsequent proceedings, such person qualifies under this subsection." *Id.*

██ More importantly, the statute also contains a provision suppressing the record of arrest almost identical to that found in section 1000.5. It provides that upon successful completion of the probationary period, the court shall enter an order:

expung[ing] from all official records . . . all recordation relating *to his arrest,* indictment, or information, trial, findings of guilty, and dismissal and discharge pursuant to this section. . . . *The effect of such order shall be to restore such person in the contemplation of the law, to the status he occupied before such arrest or indictment or information.* No person as to whom such an order has been entered shall be held thereafter under any provision of any law to be guilty of perjury or otherwise giving a false statement by reason of his failures to recite or acknowledge such ar-

determine that the fact of arrest *can* be relevant to the section 212(c) calculus.

**10.** The FFOS was repealed by the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 219, 98 Stat. 1837, 2027 (1984) (effective Nov. 1, 1987). Section 3607 of Title 18, United States Code, was promulgated by § 212(a)(2) of the same Act. *See id.* § 212(a)(2), 98 Stat. 2003–04 (effective Nov. 1, 1987). For the purposes of our analysis, the differences between 21 U.S.C. § 844(b) and 18 U.S.C. § 3607 are immaterial. As the Senate Report states, "[p]roposed 18 U.S.C. § 3607 carries forward the provisions of 21 U.S.C. § 844(b) relating to special probation without entry of judgment for first offenders found guilty of violating [21 U.S.C. § 844] if there has been no previous conviction of an offense under a Federal or State law relating to controlled substances." S.Rep. No. 98–225, 98th Cong., 2d Sess. 133 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3316.

rest, or . . . in response to an inquiry made of him *for any purpose.*

21 U.S.C. § 844(b)(2) (1988) (emphasis added); *see also* 18 U.S.C. § 3607(c) (providing a materially indistinguishable mechanism).

We think that if section 844(b)(2) or its substantially identical successor were applicable to Petitioner, he would have a compelling argument that Congress intended to preclude from the section 212(c) analysis state statutes that were the equivalent of this provision. The BIA itself has long interpreted other provisions of the INA with an eye toward eliminating disparities in treatment among aliens that results merely from the fortuity of whether a criminal prosecution has been brought by federal or state authorities. For instance, in the context of determining the meaning of the term "conviction" in the INA, the BIA has held that state statutes that are the "equivalent" of both the FFOS and the now-repealed Federal Youth Corrections Act ("FYCA"), 18 U.S.C. §§ 5005–26 (1982), *repealed by* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 218(a)(8), 98 Stat. 1837, 2027 (effective Oct. 12, 1984), should have the same effect as their federal counterparts. *See, e.g., In re Werk,* 16 I. & N. Dec. 234, 235–36 (BIA 1977) (holding that state equivalents of the FFOS are entitled to the same effect as the federal provision); *In re Andrade,* 14 I. & N. Dec. 651, 652 (BIA 1974) (holding the same with respect to the FYCA).[11] Then—

For convenience, we refer to both statutes collectively as the FFOS.

**11.** Although the meaning of the term "conviction" is a question of federal law, *see, e.g., Morales–Alvarado v. INS,* 655 F.2d 172, 174 (9th Cir.1981); *Molina v. INS,* 981 F.2d 14, 19–20 (1st Cir.1992), the INS has long held that "a conviction for a crime involving moral turpitude may not support an order of deportation if it has been expunged." *In re Ozkok,* 19 I. & N. Dec. 546, 552 (BIA 1988); *see also Garcia–Gonzales v. INS,* 344 F.2d 804, 809–10 (9th Cir.) (citing decisions), *cert. denied,* 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965). An exception to this rule was created in cases involving narcotics convictions, where the "serious Federal concern" with narcotics offenders led the Attorney General and the INS to conclude that, as long as the adjudication of guilt was sufficiently final for federal purposes, a conviction for a narcotics violation should be considered final regardless of the effect of a state expunging regime. *See, e.g., In re A—F—,* 8 I. &

Solicitor General Bork described the rationale behind this interpretation of the INA as follows:

> Expungement statutes concerning youth offenders, perhaps even more than other expungement laws, *reflect a policy of providing a clean start which would be virtually negated if deportation under federal law were still a consequence of an expunged state marihuana conviction of a youth*. . . . .
>
> Thus, [not to give effect to state equivalents of the FYCA] would tend to produce the anomalous situation where, for example, a youth offender prosecuted federally and convicted of a serious marihuana offense would not be deportable if the conviction were expunged, while one prosecuted in state court and convicted on a trivial marihuana offense would therefore be deportable, even if the conviction were expunged.

*Quoted in Andrade*, 14 I. & N. Dec. at 658–59 (emphasis added).

Consequently, we assume *arguendo* that section 212(c) must be interpreted to minimize the effect of diluting federal policy that arises from the mere fortuity that the state, and not the federal government, prosecutes an alien for a particular offense. *Cf. Kahn*, 20 F.3d at 962; *Jaramillo v. INS*, 1 F.3d 1149, 1155 (11th Cir.1993) (approving the Board's interpretation of section 212(c) in part because it furthered "a uniform nationwide application of the immigration laws"). Accepting this premise, it stands to reason that Congress did not intend that a first-time narcotics offender should be denied the benefit of section 1000.5 when, had the federal government undertaken the prosecution, an equivalent suppression provision would have been triggered.

Section 844(b)(2) and its successor provision found in 18 U.S.C. § 3607(c), however, are both limited *by their terms* to those persons under "twenty one years of age at the time of the offense." 21 U.S.C. § 844(b)(2); 18 U.S.C. § 3607(c) (same). It is apparent from this limitation that Congress did not intend to confer the same privi-

lege to first offenders *over* that age. Petitioner was 28 at the time of the arrest in question. Accordingly, it cannot be concluded that Congress, through the FFOS, impliedly has required giving effect to section 1000.5 in this case.

Petitioner maintains that, even if an implied partial repeal of section 212(c) by the FFOS is not sufficient to require the BIA to respect section 1000.5, the requisite expression of congressional intent can be found in 21 U.S.C. § 844a. Section 844a provides for the imposition of a civil penalty for simple possession if the offender previously has not been convicted of an offense relating to a controlled substance. *Id.* § 844a(a), (c). Like the FFOS, it contains an expunging provision that is tied to successful completion of certain conditions. *Id.* § 844a(j). However, unlike the FFOS but as in section 1000.5, section 844a(j) is not limited to youthful offenders. Relying on this fact as well as the observation that, under the California regime, pretrial diversion suspends all criminal proceedings, Petitioner maintains that a California court's decision to divert a defendant is equivalent to the Attorney General's decision to seek a civil penalty under section 844a as opposed to undertaking a criminal prosecution that would permit expunging only pursuant to the FFOS. Based on this premise, Petitioner reasons that the California diversion regime is the "state equivalent" of section 844a, and therefore, that the BIA must give effect to section 1000.5 in this case.

Petitioner's argument is flawed in one fundamental respect: we do not believe that any implied partial repeal of section 212(c) that might be required by section 844a would prohibit the BIA from inquiring into past *arrests*. There are significant differences between the expunging provisions contained in the FFOS and section 844a(j). As discussed above, the FFOS's expunging provision, by its express terms, evinces the broad, rehabilitative purpose of "restor[ing] [an arrestee] to the status [that person] occupied before *such arrest* and the institution of criminal proceedings." 18 U.S.C. § 3607 (emphasis added).

N. Dec. 429, 445 (BIA 1959); *de la Cruz-Martinez*, 404 F.2d at 1200 (approving this interpretation).

*Werk*, and *Andrade*, discussed in the text, represent an exception to this exception.

Consequently, it provides for the expunging of "all references to *[the] arrest for the offense," id.* (emphasis added), and permits the person to deny that the arrest that led to the criminal proceedings ever took place, *see id.*

■ By contrast, the expunging provision contained in section 844a(j) is more modest in scope. Significantly, it lacks language evincing the goal of *completely* restoring the offender to his pre-arrest status. In line with a more limited objective, section 844a(j) does not expressly call for the expunging of records of arrests, but contemplates merely that a person who successfully completes the prescribed conditions may "not be held thereafter ... to be guilty of perjury ... by reason of his failure to recite or acknowledge *a proceeding under this section or the results thereof.*" 21 U.S.C. § 844a(j) (emphasis added); *see also* 28 C.F.R. § 76.41(c) (1993) (same). Similarly, the statute's implementing regulations provide only for the expunging of "official Department records *created*" for the purposes of the civil proceeding. 28 C.F.R. § 76.41(a) (emphasis added). A *preexisting* record of an arrest, although it can be made part of the "record" of the proceeding if introduced as an exhibit, *see id.* § 76.34(c), clearly is not among the "official Department records *created pursuant,*" *id.* § 76.41(a) (emphasis added), to section 844a(j)'s implementing regulations.

Finally, we observe that section 844a was enacted subsequent to, and against the background of, the FFOS. We therefore cannot conclude that the differences between the language contained in the expunging provision was inadvertent. Congress clearly knew how to draft an expunging provision that permitted denying the fact of arrest when it desired that result. *See National Sec. Archive v. Department of Defense,* 880 F.2d 1381, 1384 (D.C.Cir.1989); *cf. City of Chicago v. Environmental Defense Fund,* —— U.S. ——, ——, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994); *King v. St. Vincent's Hosp.,* 502 U.S. 215, ———— ————, 112 S.Ct. 570, 574–75, 116 L.Ed.2d 578 (1991).

In light of the above, we conclude that Congress did not intend for expunging pursuant to section 844a(j) to have the same breadth as under the FFOS. Specifically, we hold that Congress did not intend that an arrestee who is not prosecuted criminally, but merely is assessed a civil penalty, would be entitled to an expunging of a record of arrest and the privilege of denying that the arrest took place.[12] Section 844a(j), then, would have no application to this case, which involved the initial eliciting from the petitioner of the fact of his arrest. Accordingly, even if we believed that the California diversion regime constituted the "state equivalent" of section 844a for some purposes, a question we do not decide, the resulting implied partial repeal of section 212(c) would not extend to barring the BIA from permitting the introduction of records of arrest, or the questioning Petitioner concerning such an arrest. Absent special circumstances, *see, e.g., Yepes–Prado,* 10 F.3d at 1368–69 (refusing to find that Congress delegated to the INS the "authority to inquire into and 'punish' private consensual sexual conduct"), an implied partial repeal will be found only in the face of an "'irreconcilable conflict,'" *Estate of Bell v. Commissioner,* 928 F.2d 901, 903 (9th Cir.1991), or "clear repugnancy," *United States v. Fausto,* 484 U.S. 439, 453, 108 S.Ct. 668, 676, 98 L.Ed.2d 830 (1988); *accord Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 156, 96 S.Ct. 1989, 1994, 48 L.Ed.2d 540 (1976), between the statutory schemes at issue. Because section 844a(j) does not contemplate the expunging of a record of arrest, we cannot find the requisite degree of incompatibility between that provision and the interpretation of section 212(c) supplied by the BIA in this case.

Finally, Petitioner relies upon *United States v. Hidalgo,* 932 F.2d 805, 807 (9th Cir.1991), for the proposition that, as a matter of federal law, the BIA must give effect to the diversion regime. *Hidalgo,* however, involved the question of whether a sentence had been "expunged" within the meaning of U.S.S.G. § 4A1.2(j). Although the court appeared to acknowledge that the meaning of

---

**12.** Neither party has questioned the constitutionality of the distinction drawn by Congress in the expunging regimes created by the FFOS and

§ 844a as applied to adults. We therefore leave that issue for another day.

"expunged" was itself a question of federal law, *see id.* at 807, it also recognized that determining whether a conviction was "expunged" *necessarily* required assessing the effect of a state expunging regime, *see id.* Section 212(c), by contrast, does not require the Board, in defining a term, to examine the legal effect that a state attaches to conduct or proceedings. *See Kahn,* 20 F.3d at 962. Moreover, nothing in the scant legislative history suggests an intent on the part of Congress to make the application of section 212(c) dependent on state law. *Cf. Thrall v. Wolfe,* 503 F.2d 313, 317 (7th Cir.1974) ("[A]bsent an express contrary intention, the scope of a federal statute normally is not dependent on state law." (citing *Jerome v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 485–86, 87 L.Ed. 640 (1943) (emphasis added))), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975).[13] Accordingly, *Hidalgo* is inapposite.

We are cognizant that this is a case in which "the policies of the two governments are at loggerheads: The state wishes to give the defendant a clean slate, yet federal law makes the record indelible." *United States v. Tallmadge,* 829 F.2d 767, 782 (9th Cir. 1987) (Kozinski, J., dissenting). However, given the breadth of the section 212(c) inquiry, the federal policy must trump that of California. Absent a federal policy to the contrary, state law cannot " 'rewrite history for the purposes of [federal law].' " *United States v. Bergeman,* 592 F.2d 533, 536 (9th Cir.1979) (quoting *Hyland v. Fukuda,* 580 F.2d 977, 981 (9th Cir.1978) (quoting *United States v. Potts,* 528 F.2d 883, 887 (9th Cir. 1975) (en banc) (Sneed, J., concurring))). Accordingly, in the case of this particular alien, we hold that the Board was not required to give effect to the California diversion scheme in undertaking its section 212(c) analysis.

## 2. *Did the Board Inexplicably Depart from Prior Policies?*

■ Even if the Board is not *required* to incorporate the California diversion regime

in its section 212(c) analysis as a matter of statutory interpretation, it cannot *refuse* to do so if it would thereby "act[ ] arbitrarily [by] disregard[ing] its own precedents and policies without giving a reasonable explanation for doing so." *Braun v. INS,* 992 F.2d 1016, 1019 (9th Cir.1993). Petitioner notes that, in *In re Zignis,* 14 I. & N. Dec. 621 (BIA 1974), the BIA held that a conviction set aside under the FYCA could not serve as the basis for deportation because such a result would be inconsistent with Congress's objective of "rehabilitat[ing] youthful offenders." *In re Zignis,* 14 I. & N. Dec. at 622. Section 1000.5, Petitioner contends, has the same purpose of " 'restor[ing] a successful divertee to productive citizenship without the stigma of a criminal conviction.' " Brief for Petitioner at 17 (quoting *B.W. v. Board of Medical Quality Assurance,* 169 Cal.App.3d 219, 233, 215 Cal.Rptr. 130 (1985)). Accordingly, Petitioner maintains that because the BIA gave effect to the FYCA in *Zignis,* it similarly must respect the California diversion scheme here.

■ Petitioner's analogy to *Zignis* is misplaced. *Zignis* did not hold, as Petitioner appears to contend, that an expunging or diversion statute will be given effect by the Board *whenever* it reflects a rehabilitative goal. The rationale behind *Zignis* was that when a *federal* policy indicates that Congress wishes to expunge a conviction, it should not be considered a conviction for immigration purposes. *See In re Zignis,* 14 I. & N. Dec. at 622–23 ("The desire of Congress to give youth a new chance would be thwarted by deportation. Its policy provides for expungement of offenses by juveniles is as important a congressional policy as the policy to deport narcotics offenders.").

The California diversion scheme, of course, is a *state* and not a federal enactment. Petitioner's reliance on *Zignis* would still have force, however, if a federal policy exists for which the California diversion is a "state equivalent"; as discussed above, the BIA has

---

**13.** If anything, the brief remark in the legislative history of the original version of the statute that "discretionary authority to waive the grounds for exclusion should be carefully restricted to those cases where extenuating circumstances clearly require such action and that the discretionary authority should be surrounded with strict limitations," H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1705, suggests the opposite.

a long-standing practice, based on the objective of achieving greater uniformity in the administration of the immigration laws, of giving effect to state rehabilitative statutes that mirror federal enactments. *See supra* pp. 811–812 & n. 11.

The BIA's practice, however, is not implicated in this case. The most plausible federal policy for which section 1000.5 could constitute a "state equivalent" is that found in 21 U.S.C. § 844(b)(2) and 18 U.S.C. § 3607(c), discussed above. *See supra* pp. 810–812; *see also In re Deris,* Interim Dec. 3102, 1989 WL 331858, 1989 BIA LEXIS 8, at *7–*13 (holding that the "state equivalent" policy continues to apply to section 3607). However, as noted previously, the California provision, unlike sections 844(b)(2) and 3607(c), is *not* limited to those under 21 years of age, and the Board has held that, to qualify for "state equivalent" status, the state statute must encompass roughly the *same* limited class as the federal statute. *See, e.g., Matter of Carrillo,* 19 I. & N. Dec. 77, 80 (BIA 1984); *Matter of Forstner,* 18 I. & N. Dec. 374, 376 (BIA 1983); *Matter of Golshan,* 18 I. & N. Dec. 92, 95 (BIA 1981).[14] Of course, if the California statute were so limited, Petitioner, who was 28 at the time of the arrest in question, would not qualify under it. Similarly, assuming *arguendo* that the California regime qualifies as a "state equivalent" of section 844a for some purposes, as explained above section 844a's expunging provision does not reach records of arrest or inquiries concerning arrests. For this reason, the broader expunging provisions found in section 1000.5, in the context of this particular case, cannot be considered the "state equivalent" of section 844a(j).

Our recent decision in *Garberding v. INS,* 30 F.3d 1187 (9th Cir.1994), does not change this analysis. There, we held that the INS's policy that a state expunging statute must be "an exact counterpart" to the FFOS, under certain circumstances, violated an alien's right to equal protection. *Id.* at 1190–91. *Garberding,* however, involved the situation in which the alien would have been able to avoid deportation *had* she been convicted in a jurisdiction that possessed an expunging regime that precisely mirrored the FFOS. *See id.* The vice of the INS's policy, as applied in that case, was the lack of any rational basis for not respecting the state expunging statute at least *to the same extent* to which other state expunging regimes would be honored. We did not hold, however, that a rational basis was lacking for refusing to honor a state expunging statute in a case in which the conviction would *not* have been expunged under the FFOS. For instance, in *Garberding,* had the petitioner been convicted of an offense more serious than simple possession she might have been eligible for expunging under the Montana statute at issue but not under the FFOS. *See id.* at 1189–90. Nothing in the *Garberding* court's analysis would require giving effect to the Montana statute in this situation. Indeed, reaching the opposite conclusion would undermine the very objective of achieving greater uniformity in the administration of the immigration laws that, as discussed above, the INS's policy of giving effect to "state equivalents" of the FFOS is designed to serve.

We therefore conclude there is a rational basis for refusing to give effect to a state expunging regime *to the extent* that it covers a broader class of conduct than a comparable federal enactment. The same reasoning applies to the INS's refusal to give effect to a state expunging statute to the extent that covers a broader class of persons than the relevant federal enactment. Accordingly, *Garberding* does not require the INS to honor section 1000.5 as applied to nonyouthful offenders, who would not be eligible for expunging under the FFOS. Similarly, the interest in uniformity provides a rational basis for not giving effect to a state expunging regime to the extent that it provides more generous consequences upon expunging than the relevant federal statute. For this reason, section 844a does not require the INS to respect section 1000.5 to the extent that sec-

---

**14.** We do not hold that the California diversion regime does not qualify as a "state equivalent" to section 3607 for other purposes. *Cf. In re Deris,* 1989 WL 331858, 1989 BIA LEXIS 8 at *7–*13.

We only decide that the suppression provisions found in section 1000.5 do not constitute a state equivalent of 21 U.S.C. § 844(b)(2) or 18 U.S.C. § 3607(c).

tion 1000.5 permits the expunging of arrest records.

## B. *The Board did not Abuse its Discretion in Denying Section 212(c) Relief*

In addition to claiming that the BIA mistakenly failed to adhere to section 1000.5, Petitioner asserts that the BIA erred in two other respects: first, by failing to find rehabilitation, and second by finding that Petitioner had given false testimony concerning his service in the military. Because of these erroneous determinations, Petitioner maintains, the Board improperly weighed the equities and thereby abused its discretion. We reject these contentions.

### 1. *Rehabilitation*

The record supports the BIA's determination that Petitioner did not establish rehabilitation. Petitioner claims that the "BIA disregarded the extensive evidence of rehabilitation presented without providing a reasonable explanation for doing so." Brief for Petitioner at 32. However, a close examination of the BIA's decision reveals that it addressed both the positive and the adverse factors, and that the finding of no rehabilitation was based on a consideration of all relevant factors. *See* Admin.Rec. at 10–11.

Petitioner also contends that the Board should have agreed with the dissenting Board Member that Petitioner has had "essentially an untarnished record since 1979." *Id.* at 13 (Dunne, concurring in part and dissenting in part). However, to hold that the BIA should have embraced this conclusion requires accepting one of two arguments. The first is that the IJ should not have questioned Petitioner or his wife concerning the 1986 arrest nor introduced the FBI rap sheet. As discussed above, we

think the Board permissibly determined that it need not adhere to section 1000.5 in conducting its section 212(c) analysis. · The second is that, even if the California diversion statute doesn't apply, the conclusions that the BIA drew from the arrest were impermissible.

Although we would be troubled if this were a case in which the Board found the *mere fact* of arrest probative of whether Petitioner had engaged in underlying conduct,[15] here, the Board had before it much more. Petitioner testified that he was arrested at a friend's house at which drugs were found. This friend was an acquaintance from Petitioner's days as a gang-member, when Petitioner abused PCP, *see* Admin.Rec. at 114, 136, and Petitioner admitted that he sometimes (albeit rarely) associated with the people he was involved with during that period, *id.* at 108.[16] Although Petitioner maintains that he was arrested merely because he was in the wrong place at the wrong time, his testimony concerning whether he knew his friend had drugs for sale was contradictory.[17] Whether or not this evidence would have been sufficient to justify a conviction, we do not believe that, under the substantial evidence standard, · *see INS v. Elias–Zacarias,* 502 U.S. ——, —— n. 1, 112 S.Ct. 812, 815 n. 1, 117 L.Ed.2d 38 (1992), a reasonable factfinder would be compelled to reject the Board's conclusion that the arrest "demonstrates his ... probable continued use of illegal drugs," Admin.Rec. at 10. In addition, we believe the Board permissibly determined that Petitioner's uttering of obscenities toward the arresting officers was probative of his "bad character and disrespect for the law." *Id.*

Finally; again relying upon Board Member Dunne's dissent, Petitioner argues

---

**15.** *Cf. Sierra–Reyes v. INS,* 585 F.2d 762, 764 n. 2 (5th Cir.1978) (contending, in dicta, that police reports concerning conduct for which no prosecution resulted "were not probative of anything and should not have been counted as 'adverse factors'" in denying section 212(c) relief).

**16.** Indeed, even dissent Board Member Dunne conceded that Petitioner's "continuing association" with this friend constituted an appropriate adverse factor. *See* Admin.Rec. at 14 (Dunne, concurring in part and dissenting in part).

**17.** Petitioner testified initially that, prior to his arrest, his friend told him that he had drugs for sale. *See* Admin.Rec. at 112–13. Later, however, Petitioner changed his story (without confessing error as to his earlier testimony), and maintained that he found out that his friend was involved with drugs only *after* the arrest. *See id.* at 137–38.

that, in determining rehabilitation, the Board should have placed significant emphasis on the fact that he had taken responsibility for his past criminal conduct. However, the record reveals that Petitioner denied responsibility for possessing a concealed weapon in an automobile despite the fact he was convicted for that offense. *See* Admin.Rec. at 116, 187. Moreover, although Petitioner was convicted on four counts of armed robbery in August 1979, he initially denied his involvement in two of them. *See id.* at 130. Finally, with respect to the May 1979 robbery, Petitioner admitted he was arrested but insisted that he "didn't commit that robbery." *Id.* at 134. In light of this testimony, we cannot conclude the Board erred in failing to take into account Petitioner's quite limited acceptance of responsibility.

### 2. *False Testimony*

During the questioning of Petitioner before the IJ, the following colloquy took place between the INS's counsel and Petitioner:

Q: Did you serve in the military?

A: No.

Q: You never served in the military?

A: No.

Q: You never served in the U.S. Army?

A: Yea, well ...

Q: Didn't you serve in the U.S. Army?

A: It was brief, I don't know whether you [would] call [it] service or not.

Admin.Rec. at 124. Subsequently, Petitioner revealed that he had been dishonorably discharged and court-martialled. *Id.* at 125. In his opinion, the IJ maintained that Petitioner changed his answer from "No" only when he "realized that the trial attorney had in her possession a record indicating that [Petitioner] had in fact served in the military [and] that he had been court martial[l]ed and discharged with less than an honorable discharge," *id.* at 47, and concluded on this basis that Petitioner "gave false testimony with respect to his military service for the purpose of obtaining ... relief from deporta-

tion pursuant to Section 212(c)," *id.* at 48. The Board adopted this finding. *Id.* at 10.

Petitioner contends that this finding is unsupported by the record. He maintains that the record establishes only that he was "ashamed" of his dishonorable discharge, *id.* at 146, and simply wished to avoid embarrassment, which would not be sufficient to support a finding of specific intent to deceive the IJ. *Cf. Kungys v. United States,* 485 U.S. 759, 780, 108 S.Ct. 1537, 1551, 99 L.Ed.2d 839 (1988) (accepting the government's argument that 8 U.S.C. § 1101(f)(6), which precludes a finding of good moral character when false testimony is given for the purpose of obtaining a naturalization benefit, proscribes only the "precise intent" to obtain the benefit sought and not "[w]illful misrepresentations made for other reasons, such as embarrassment").

■ Because the IJ appeared to find that the specific intent described in *Kungys* was necessary to support his false testimony determination, we assume *arguendo* that *Kungys* provides the appropriate standard. We further note that the IJ's finding that Petitioner acted with the relevant intent was based on an adverse credibility determination. That determination must be accorded "substantial deference" as long as it is supported by a " 'specific, cogent reason' for the disbelief." *Berroteran–Melendez v. INS,* 955 F.2d 1251, 1256 (9th Cir.1992) (quoting *Turcios v. INS,* 821 F.2d 1396, 1399 (9th Cir. 1987)). However, "[w]e do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion, and to determine whether the reasoning employed by the IJ is fatally flawed." *Aguilera–Cota v. INS,* 914 F.2d 1375, 1381 (9th Cir.1990).

In this case, the IJ's credibility determination rested solely on the IJ's finding that Petitioner changed his story *because* he realized that the INS attorney possessed "a record indicating that he had in fact served in the military." Admin.Rec. at 47.[18] This

---

**18.** The IJ conceded that Petitioner, when questioned concerning his misrepresentation, maintained that he merely was ashamed of his military service, *see* Admin.Rec. at 48, but concluded

that "this d[oes] not constitute a timely recantation." *Id.* It is clear that the IJ in this latter passage was referring to his earlier conclusion that Petitioner "testified unequivocally that he

finding encompassed both a factual premise—that Petitioner changed his testimony upon ascertaining that the INS attorney possessed a record of his service—and an inference drawn from that premise—that a change of testimony so induced indicates that the petitioner had the specific intent required by *Kungys*.

The IJ's factual premise, because it is based solely on his purported eye-witness observation of Petitioner's reactions, rests on inferences drawn *exclusively* from the petitioner's demeanor. We previously have recognized that inferences based solely on demeanor, often described as testimonial inferences, *see Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078–79 (9th Cir.1977) (discussing *NLRB v. Universal Camera Corp.*, 190 F.2d 429, 432 (2d Cir.) (Frank, J., concurring), *on remand from* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)), are entitled to " 'special deference.' " *Laipenieks v. INS*, 750 F.2d 1427, 1430 (9th Cir.1985) (quoting *Penasquitos Village*, 565 F.2d at 1074); *see also Did Bldg. Servs., Inc. v. NLRB*, 915 F.2d 490, 494 n. 4 (9th Cir.1990) (noting that a hearing officer's "demeanor-based credibility findings" are "assign[ed] special weight").

The reason for according testimonial inferences "special" deference is readily apparent. As Judge Wallace explained in *Penasquitos Village*:

> Weight is given the administrative law judge's determinations of credibility for the obvious reason that he or she "sees the witness and hears them testify, while the Board and the reviewing court look only to cold records." *NLRB v. Walton [Mfg.] Co.*, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). All aspects of the witness's

demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely. The same very important factors, however, are entirely unavailable to a reader of the transcript, such as the Board or the Court of Appeals.

*Penasquitos Village*, 565 F.2d at 1078–79.

■ The very factors that require us to give special deference to testimonial inferences, however, creates a puzzle for how we are to perform our review under the substantial evidence standard when the Board has agreed with the IJ. *Cf. Aguilera–Cota*, 914 F.2d at 1381 n. 6 (noting that although the "evasiveness" of a petitioner can be "determined objectively from an examination of the record," "[d]emeanor evidence may present a somewhat different problem").[19] We certainly cannot expect that the factual basis for eye-witness observations always will find support in the hearing transcript. On the otherhand, "special deference" does not imply a complete absence of judicial scrutiny. As Judge Duniway explained eloquently in his concurrence in *Penasquitos Village*, labeling a finding one based on "demeanor" should not lead "factfinders to believe that to make their findings almost totally unassailable they need only use the right incantation." *Penasquitos Village*, 565 F.2d at 1086 (Duniway, J., concurring in part and dissenting in part); *see also Kopack v. NLRB*, 668 F.2d 946, 954 (7th Cir.1982) (suggesting that *Penasquitos Village* should not be read to "requir[e] the reviewing court to rubber-stamp an ALJ's finding[ ] based on demeanor").[20]

had never served in the military *until* he realized that the trial attorney" possessed a record of his service. *Id.* at 47 (emphasis added). Accordingly, we conclude that this particular finding formed the basis of the IJ's conclusion that Petitioner gave false testimony "for the purpose of obtaining a benefit under the Immigration and Nationality Act." *Id.* at 48.

**19.** We have held previously that, when the BIA makes a demeanor finding that the IJ did not embrace, that finding must have specific support in the administrative record. *See Martinez–San-*

*chez v. INS*, 794 F.2d 1396, 1400 (9th Cir.1986) (rejecting the BIA's determination that the petitioner was not credible "on the basis of his demeanor" because "[t]he record indicate[d] nothing about petitioner's demeanor").

**20.** Moreover, the IJ's factual findings, even when based on demeanor evidence, are not *conclusive* on the Board. *See, e.g., Laipenieks*, 750 F.2d at 1429–30; *Penasquitos Village*, 565 F.2d at 1079. However, even in this situation, an appellate court must " 'scrutinize the Board's findings of fact more critically,' " if they are contrary to the

Judge Duniway (and Judge Choy, who joined in Judge Duniway's concurrence on this point, *see Penasquitos Village,* 565 F.2d at 1087 (Choy, J., concurring)), however, primarily was concerned with giving unwarranted deference to credibility determinations that did not, in fact, "rely on demeanor alone." *Id.* at 1086 (Duniway, J., concurring). Here, by contrast, we consider *only* whether to credit an IJ's factual finding that was based exclusively on inferences drawn from eye-witness observation. We consider separately below, and under a less deferential standard of review, the *separate* question of whether the factual finding made is probative of Petitioner's credibility. The concern that labelling a finding based on "demeanor" evidence will create an "impenetrable wall" that will "protect the myth and folklore" that finders of fact can interpret demeanor evidence with the precision of a lie detector, *id.* at 1084, 1086, is implicated far less significantly when the question involves, as it does here, solely the factual basis for ultimate credibility determination, and not the link between that factual predicate and the ultimate credibility determination itself.

█ Accordingly, in this particular context, we hold that the IJ's factual finding as to why Petitioner changed his testimony is entitled to "special deference." We further hold that special deference requires us to credit this exclusively demeanor-based finding unless the record creates such a doubt as to its validity that accepting it would be unreasonable. *Cf. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951) (explaining that a hearing examiner's findings should not be "given more weight than in reason and in light of judicial experience they deserve").

█ Here, accepting the IJ's assertion that Petitioner changed his testimony because he realized that the INS's counsel possessed a document that contained the details of his military service is not unreasonable. Petitioner contends that the administrative record demonstrates that the INS's counsel did not possess any records relating this his

IJ's. *Laipenieks,* 750 F.2d at 1430 (quoting *Loomis Courier Serv., Inc. v. NLRB,* 595 F.2d 491, 496 (9th

military service. It is true that no document that mentioned Petitioner's military service was made part of the administrative record. Indeed, the Service's attorney, candidly admitting that the INS had not yet "conducted an investigation [of the petitioner] in connection with th[e] application for [section] 212(c) relief," required a continuance for the *specific purpose* of obtaining, *inter alia,* "the documents pertaining or relating to military service." Admin.Rec. at 152. The IJ, noting that the INS had been given the benefit of over five years to prepare for the hearing, denied the motion, at which time the INS attorney conceded that she had "[no] documents to offer into evidence." *Id.* at 153. Accordingly, if the IJ's finding is understood to refer to a *specific* record in evidence, we would be compelled to conclude from the record that no such document existed.

We do not, however, read the IJ's finding so narrowly. The IJ stated that counsel for the INS possessed "*a* record *indicating* that [Petitioner] had in fact served in the military." Admin.Rec. at 47 (emphasis added). The "record" to which the IJ referred could have been inadmissible. Moreover, and more importantly, the IJ did *not* contend that the Service's counsel brandished a particular document in front of Petitioner. Instead, the IJ maintained only that it was when Petitioner "*realized* that the trial attorney" possessed the relevant record that he changed his testimony. *Id.* (emphasis added). We conclude that it is quite reasonable to interpret the IJ as having found that Petitioner changed his answer because it dawned on him, for some reason that was not necessarily related to his viewing a particular document, that the IJ must have in her possession information that would contradict his answer to her queries.

This interpretation of the IJ's finding is supported by the trial transcript. As described above, Petitioner was asked *three* separate times if he served in the military before he answered truthfully. Between the second and the third time he was questioned, the Service's counsel changed her focus from

Cir.1979)).

whether Petitioner had served in the *military* to whether he had served in the *U.S. Army.* *See supra* p. 817. It only was after counsel reformulated her question in this manner that Petitioner answered truthfully. Clearly, Petitioner changed his answer for *some* reason, and this portion of the transcript supports the view that it was because counsel asked a more narrow question. Moreover, we believe that the more focused nature of counsel's questioning not only indicates that she must have possessed *some* information concerning Petitioner's military service, *see also* Admin.Rec. at 125 (asking Petitioner if his service took place in 1976 instead, as he claimed, in 1977), but also supports the IJ's conclusion that Petitioner became aware of this fact. Accordingly, the trial transcript is consistent with the view that it was *because* Petitioner realized that the IJ had this information that he changed his testimony.

It is true that, later in the hearing, the IJ questioned Petitioner specifically concerning why he first testified untruthfully:

Q: Why did you first testify that you did not serve in the military?

A: Because I wasn't sure that I, I don't know, Your Honor.

Q: *Well, I don't know either.* You enlisted in the military.

A: I mean, I didn't want to bring [up] that I was dishonorably discharge[d] from the army.

Q: You mean you testified that you didn't serve in the military, because you didn't want me to know that you had been dishonorably discharged?

A: Yes, I'm ashamed of that.

Admin.Rec. at 145–46 (emphasis added).

It can be argued that this portion of the transcript casts doubt on the veracity of the IJ's observation. Specifically, there appears, at first blush, a tension between the explanation for Petitioner's change of testimony later given by the IJ and his statement at this stage of the proceedings that he did not know why Petitioner changed his testimony. However, the IJ's refusal to confront Petitioner with the ultimate basis for the credibility finding is readily explicable. For in-

stance, it appears to us that the IJ, during the above interchange, just as well might have been giving Petitioner a chance to explain himself. Although we would find ourselves undoubtedly on firmer ground if the IJ had articulated his eventual factual finding during the questioning, we cannot conclude that the above interchange compels the conclusion that, as Petitioner maintains, the IJ's explication of Petitioner's conduct is a mere ex post fabrication.

We therefore conclude that we must credit the IJ's factual assertion that it was because Petitioner "realized that the trial attorney had in her possession [a document] indicating that he had in fact served in the military" that he changed his testimony. This holding, however, does not end our inquiry. To withstand scrutiny under the substantial evidence standard, the reasons given by the IJ for not finding the petitioner credible "must be substantial and must bear a legitimate nexus to the [ultimate determination]." *Aguilera–Cota,* 914 F.2d at 1381. We therefore must inquire whether there is "a rational and supportable connection," *id.* at 1381, between the IJ's factual premise and his ultimate conclusion that Petitioner's explanation that he merely was "ashamed" of his conduct was not credible.

We do not find fault in the IJ's reasoning. It is a fair inference that a person who gives an unequivocally negative answer until he realizes that the interrogator possesses facts that contradict his explanation is not *merely* ashamed of the fact denied, but has given a negative answer, in part, for the purpose of deceiving the tribunal. Indeed, we note that, in this case, Petitioner was quite willing to reveal *all* the details concerning his military service, including the reason for his discharge, once he made the initial recantation. This conduct appears to us more consistent with the IJ's finding that Petitioner realized "the gig was up" than Petitioner's later explanation that he misrepresented his service record because he was ashamed of his dishonorable discharge.

Accordingly, we conclude that the IJ's credibility determination is supported by a

"specific, cogent reason for the disbelief." *Berroteran–Melendez,* 955 F.2d at 1256. We therefore hold that the IJ's determination that Petitioner gave false testimony for the purpose of obtaining section 212(c) relief is supported by substantial evidence.

\* \* \*

█ Because we conclude that substantial evidence supports the Board's determination both that Petitioner failed to demonstrate rehabilitation and that he gave false testimony to the IJ for the purposes of obtaining section 212(c) relief, we find no basis for concluding that the Board abused its discretion in weighing the factors involved. The Board noted that Petitioner exhibited "unusual or outstanding equities," determined that significant countervailing adverse factors were present, and permissibly found that Petitioner had failed to establish rehabilitation.[21] It then weighed the adverse factors against the positive factors in light of the lack of rehabilitation, and concluded that the adverse factors outweighed the positive equities.[22] The Board did not rely on any inappropriate factors, applied the correct methodology in comparing the factors, and weighed them in a reasonable manner; accordingly, we cannot find that the result reached was impermissible.

## IV. Conclusion

For the reasons articulated above, we hold that the BIA was not compelled to honor the strictures of the California diversion scheme in this case. In addition, we conclude that the Board did not abuse its discretion in denying Petitioner relief under section 212(c). Accordingly, the petition for review is

**DENIED.**

---

21. We note that, in making this determination the BIA appropriately took into account not only Petitioner's arrest, but also the fact that he successfully completed the diversion program.

22. Unlike in *Yepes–Prado,* the Board here recognized that rehabilitation is not a *prerequisite* for obtaining relief but only "a factor to be considered in the exercise of discretion." Admin.Rec. at 9 (citing *Edwards* ). *Cf. Yepes–Prado,* 10 F.3d at 1373 (concluding that the BIA inexplicably departed from *Edwards* by stating that rehabilitation *must* be established when a criminal record exists).