Christopher John DILLINGHAM, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 97-71038.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 16, 2001

Filed Sept. 14, 2001

---

Paul A. Davis, Munger, Tolles & Olson LLP, Los Angeles, California, Jimmy W. Go, Go & Laster, Portland, Oregon, for the petitioner.

Matthew R. Hall, Department of Justice, Washington, DC, for the respondent.

Before: B. FLETCHER, FERNANDEZ, and PAEZ, Circuit Judges.

Opinion by Judge B. FLETCHER; Dissent by Judge FERNANDEZ.

BETTY B. FLETCHER, Circuit Judge:

 In this case, we consider whether an alien's right to equal protection is violated if, in the course of removal proceedings, the Immigration and Naturalization Service ("INS") refuses to recognize the effects of a British expungement[1] statute

---

1. Throughout this opinion, we use the term "expungement" to refer generally to the effect of a rehabilitative statute on a prior conviction—regardless of whether, as a procedural matter, the statute allows for a deferral of the conviction itself, such that no judgment is ever entered (as under the FFOA), or a judgment of conviction is entered but later removed from the books (as under various state rehabilitative statutes, as well as the British statute at issue in this case). Such distinctions are irrelevant under both Ninth Circuit and BIA case law. *See Lujan–Armendariz,* 222 F.3d 728, 735–36 (9th Cir.2000); *Garberding v. INS,* 30 F.3d 1187, 1189 (9th Cir. 1994); *Matter of Manrique,* Int. Dec. 3250 (BIA 1995).

on a simple drug possession offense that would have qualified for federal first offender treatment had it occurred in the United States. The petitioner in this case, Christopher John Dillingham, is a 37 year-old native and citizen of Great Britain. He entered the United States in July 1992 and, after overstaying his visitor's visa, applied for adjustment of status to legal permanent resident in May 1993. The Board of Immigration Appeals ("BIA") ruled that Dillingham was ineligible for such adjustment because of a prior conviction in Great Britain for simple possession of marijuana and cocaine, in spite of the fact that the conviction had been expunged pursuant to a British rehabilitation statute for first-time offenders. We conclude that, in accordance with our holdings in *Garberding v. INS*, 30 F.3d 1187 (9th Cir. 1994), *Paredes–Urrestarazu v. INS*, 36 F.3d 801 (9th Cir.1994), and *Lujan–Armendariz v. INS*, 222 F.3d 728 (9th Cir. 2000), the BIA's decision violated Dillingham's right to equal protection by refusing to recognize the foreign expungement. Accordingly, we reverse the decision of the BIA and remand for a discretionary determination as to adjustment of Dillingham's status.

## I.

Dillingham pled guilty in April 1984 to criminal charges in Great Britain for possessing marijuana and cocaine, paying a 50 fine. As a first-time offender convicted of a minor controlled substance offense, Dillingham's conviction was later expunged pursuant to Great Britain's Rehabilitation

of Offenders Act of 1974. Under the terms of the Act, a conviction is treated as "spent" if an offender complies with his sentence and is not convicted of a subsequent offense within five years. In such cases, the statute requires that the offender be treated "for all purposes in law as a person who has not committed or been charged with or prosecuted for or convicted of or sentenced for the offense," except that any penalty resulting from the conviction that extends beyond the five-year period is unaffected, and evidence of the conviction may be introduced in a subsequent criminal proceeding.[2]

In September 1991, seven years after his drug conviction (and two years after his rehabilitation), Dillingham married his U.S.-citizen wife. Although his conviction rendered him inadmissible[3] to the United States under INA § 212(a)(2)(A)(i)(II) (codified at 8 U.S.C. § 1182(a)(2)(A)(i)(II)),[4] he was permitted to enter the country in July 1992 on a six-month nonimmigrant visitor visa, pursuant to the waiver provisions of 8 U.S.C. § 1182(d)(3)(A). After his authorized period of stay had expired, Dillingham applied for adjustment of status to legal permanent resident on May 13, 1993, pursuant to an immediate relative visa petition filed by his wife under 8 U.S.C. § 1255. The INS district director in Portland, Oregon, denied his application on September 14, 1993, on the grounds that the British Rehabilitation of Offenders Act was not a counterpart to the Federal First Offenders Act ("FFOA"), and that his prior drug conviction therefore rendered him inadmissible.

**2.** Dillingham asserts, and the INS does not dispute, that he has not been involved in any criminal activity and been free of drug use since that time.

**3.** IIRIRA replaced the term "excludable" with "inadmissible." IIRIRA § 308(d).

**4.** Under this provision, an alien "convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of ... a violation of (or a conspiracy or attempt to violate) any law or regulation of ... a foreign country relating to a controlled substance ... is inadmissible." 8 U.S.C. § 1182(a)(2)(A)(i)(II).

On November 16, 1993, the INS issued an Order to Show Cause, charging him with deportability as an alien who (1) had remained in the United States beyond the period of his authorized stay; and (2) was excludable at the time of his entry due to a prior controlled substance offense, pursuant to 8 U.S.C. § 1182(a). At his hearing before an Immigration Judge ("IJ") on October 25, 1994, Dillingham admitted the factual basis of the charges against him except for the fact of his conviction, and conceded his deportability for overstaying his visa. Following a continuance, Dillingham reasserted his eligibility for adjustment of status to that of a legal permanent resident, on the ground that his expunged conviction no longer precluded his application. This time, Dillingham cited the BIA's decision in *Manrique,* Int. Dec. 3250 (BIA 1995), in which the Board established a policy of treating aliens who had been convicted of simple possession and rehabilitated under any state's expungement statute equivalently to those who had been convicted and rehabilitated under the FFOA.[5]

On June 13, 1996, the IJ ruled that *Manrique* did not extend to foreign rehabilitation statutes and denied the application for adjustment of status. He also ordered Dillingham deported[6] and denied voluntary departure. The IJ found Dillingham to be "deserving of favorable discretion" and "undoubtedly a worthy candi-

date for permanent residence in this country." He also stated that he would have "no hesitation" in approving Dillingham's application for permanent residence and would do so "in a heartbeat," but for his conclusion that Dillingham was statutorily ineligible for discretionary relief. Hence, Dillingham's application for adjustment of status was not denied as a matter of discretion, but because of perceived statutory ineligibility.

On appeal, the BIA (sitting en banc) reversed the IJ's denial of Dillingham's application for voluntary departure, concluding that Dillingham had established that he had been a person of good moral character for the five years prior to his application.[7] However, the Board affirmed the IJ's decision regarding adjustment of status and expressly limited its expungement recognition policy to cases "meeting the strict four-part test outlined" in *Manrique.* Specifically, the Board analogized the expungement of Dillingham's prior drug offense to a foreign pardon and declined to recognize it for U.S. immigration purposes. Accordingly, the Board dismissed Dillingham's appeal with respect to the denial of adjustment of his status. One BIA member dissented on the grounds that the Board's decision conflicted with its earlier cases and violated Dillingham's due process right to equal protection.

**5.** The BIA's decision in *Manrique* followed our holding in *Garberding* and constituted a reversal of its former policy of not recognizing, for immigration purposes, the effects of state rehabilitation laws that were not the exact counterparts of the FFOA. Under *Manrique,* the BIA created a four-part test for determining when an expungement pursuant to a state rehabilitative statute should be recognized: (1) the alien is a first offender; (2) the alien has pled to or been found guilty of a simple possession offense; (3) the alien has not been accorded first offender treatment under any law; (4) the court has entered an

order pursuant to a state rehabilitative statute either deferring or dismissing the criminal proceedings.

**6.** Interestingly, the IJ did not find Dillingham deportable on the ground that he was an alien excludable at entry, but rather on the ground that he had overstayed his visa.

**7.** The Service did not appeal the IJ's finding that Dillingham was not deportable due to his inadmissibility at time of entry.

Dillingham now petitions for review of the BIA's decision in this court.

## II.

As an initial matter, we must consider whether, as an appellate court, we have jurisdiction to review Dillingham's petition.

The INS initiated deportation proceedings on November 16, 1993, and the BIA entered a final order of deportation on August 20, 1997. Dillingham timely filed a petition for review in this court on September 15, 1997. Our jurisdiction is therefore governed by the so-called transitional rules of IIRIRA § 309(c)(4) (codified at 8 U.S.C. § 1252).

■ Notably, the transitional rules prohibit appeals from a "discretionary decision" of the Board, such as adjustment of status, pursuant to IIRIRA § 309(c)(4)(E). However, Dillingham's application for adjustment of status was not denied as a matter of discretion, but because of statutory ineligibility. Hence, Dillingham does not appeal the Board's discretionary denial of his application for adjustment of status, but rather the BIA's determination that he is statutorily ineligible to seek such discretionary relief.

■ Pursuant to the transitional rules, we are deprived of jurisdiction to review final orders of deportation for aliens convicted of certain controlled substance offenses.[8] However, as we held in *Magana–Pizano v. INS*, 200 F.3d 603, 607 (9th Cir.1999), we have jurisdiction to determine whether the facts relevant to our jurisdiction exist. *See also Aragon–Ayon*

*v. INS*, 206 F.3d 847, 849 (9th Cir.2000); *Lujan–Armendariz v. INS*, 222 F.3d at 734 (9th Cir.2000). Thus, we have authority to review the central issue in this case—namely, whether Dillingham still stands convicted of "having committed a [controlled substance] offense" following the expungement of his 1984 simple possession offense in Great Britain.

In addition to contending that we lack jurisdiction due to Dillingham's expunged conviction, at the eleventh hour the Service raised the argument that we are divested of jurisdiction because Dillingham admitted the facts of his conviction to INS officers. Specifically, the Service contends that under INA § 212(a)(2)(A)(i) (codified at 8 U.S.C. § 1182(a)(2)(A)(i)),[9] even apart from his conviction, an alien who admits having committed a controlled substance offense is rendered statutorily inadmissible and ineligible for adjustment of status.

We believe that under the terms of § 212(a)(2)(A)(i), however, the fact that Dillingham "admitted" his prior offense is of no greater consequence than the conviction itself. Tellingly, the language of IIRIRA § 309(c)(4)(G) is identical for aliens deemed inadmissible by the INS, as for those deemed deportable. Thus, the interpretation of INA § 212(a)(2)(A)(i) and IIRIRA § 309(c)(4)(G) pressed upon us by the Service would require overturning *Lujan–Armendariz* as well as every other case in which we have held under the transitional rules that aliens who plead guilty to first-time possession offenses may nonetheless avail themselves of domestic rehabilitation

---

**8.** IIRIRA § 309(c)(4)(G) reads: "there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in [INA] section 212(a)(2)...."

**9.** 8 U.S.C. § 1182(a)(2)(A)(i)(II) reads, in pertinent part: an alien "convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of ... a violation of (or a conspiracy or attempt to violate) any law or regulation of ... a foreign country relating to a controlled substance ... is inadmissible."

statutes to expunge their convictions. Put another way, pursuant to the INS's position, every time an alien pled guilty to a simple possession charge, whether in the U.S. or abroad, he would be unable to avail himself of the Federal First Offender Act (or state law equivalents), and appellate panels would be stripped of jurisdiction to review his petition.[10]

We reject this position and conclude that we have jurisdiction to review the central issue in this case: namely, whether Dillingham is statutorily ineligible for discretionary relief because he still stands convicted of a prior drug offense. *See also Webster v. Doe*, 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (holding that absent a clear statement of congressional intent, limitations on judicial review should not be construed to prevent review of substantial constitutional questions); *cf. INS v. St. Cyr*, —— U.S. ——, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

### III.

■■■■ In cases where the Board has exercised its power to conduct a de novo review of the IJ's decision, we only review the decision of the BIA. *Yepes–Prado v. INS*, 10 F.3d 1363 (9th Cir.1993). The BIA's factual findings are reviewed under the substantial evidence standard. *Paredes–Urrestarazu*, 36 F.3d at 807. The BIA's conclusions regarding questions of law are reviewed de novo, *id.*, except to the extent that they involve interpretations

of ambiguous statutory provisions that were intended by Congress to be left to the agency's discretion. In such cases, deference is owed to the BIA's reasonable interpretations of such provisions, so long as they do not contravene other indications of congressional intent. *INS v. Aguirre–Aguirre*, 526 U.S. 415, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *Chevron USA Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### IV.

■■■■ "It is well established that all individuals in the United States—citizens and aliens alike—are protected by the Due Process Clause of the Constitution." *Garberding*, 30 F.3d at 1190 (citing *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)). "It is equally well established that the Due Process Clause incorporates the guarantees of equal protection." *Id.* (citing *Johnson v. Robison*, 415 U.S. 361, 364 n. 4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974)). The Supreme Court defines the constitutional right to "equal protection of the laws" as a "personal right," *Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *cf. Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) ("The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights."). We take special note of the

---

**10.** In support of its novel interpretation, the Service cites the case of *Ruckbi v. INS*, 159 F.3d 18 (1st Cir.1998), which, like the present case, involved an alien who was married to a U.S. citizen and sought adjustment of status after being ordered deported by the INS for overstaying his non-immigrant visa. The *Ruckbi* court held that because the alien admitted committing the elements of several crimes involving larceny and forgery in Massachusetts, it was stripped of jurisdiction over

his final order of deportation under IIRIRA § 309(c)(4)(G). However, *Ruckbi* is clearly inapposite to Dillingham's petition—not only because it involved state crimes committed on United States soil, but also (and more importantly) because it involved an admission of multiple crimes of moral turpitude, for which there is no expungement statute comparable to the Federal First Offender Act. Hence, the *Ruckbi* court was correct to dismiss the petition in that case for lack of jurisdiction.

fact that we have based our previous decisions in *Garberding* and its progeny upon this equal protection right, unamended by ancillary constitutional considerations such as state sovereignty. Furthermore, we find no reason why the right in its personal nature should not extend to Dillingham just as it did to the claimants in our previous cases.

Under equal protection analysis, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). We review such classifications to determine whether they are supported by a rational basis. *See id.* at 319–320, 113 S.Ct. 2637. Furthermore, because federal authority in immigration matters is plenary, federal classifications differentiating between groups of aliens are subject to "relaxed scrutiny." *Nyquist v. Mauclet,* 432 U.S. 1, 7 n. 8, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977); *Garberding,* 30 F.3d at 1190. Such classifications will be held valid unless "wholly irrational." *Mathews,* 426 U.S. at 83, 96 S.Ct. 1883; *Garberding,* 30 F.3d at 1190; *Sudomir v. McMahon,* 767 F.2d 1456, 1464 (9th Cir.1985). We apply these established principles in our discussion below.

## A.

As a general rule, the BIA does not recognize expungements of controlled substance offenses for federal immigration purposes. *See Matter of A–F,* 8 I & N Dec. 429 (1959). However, in 1970, Congress carved out a narrow exception for simple possession offenses when it enacted the Federal First Offender Act

("FFOA"). The FFOA, which applies exclusively to first-time drug offenders who are guilty only of simple possession, serves to expunge such convictions (after the successful completion of a probationary period) and was intended to lessen the harsh consequences of certain drug convictions, including their effects on deportation proceedings. *See Lujan–Armendariz,* 222 F.3d at 735. Under the FFOA, no legal consequences may be imposed following expungement as a result of the defendant's former conviction. 18 U.S.C. § 3607.

In *Garberding,* we rejected on equal protection grounds the BIA's policy that only expungements under exact state counterparts to the FFOA could be recognized in deportation proceedings. We held that this policy was inconsistent with the Constitution's equal protection guarantee, because there was "no rational basis for treating two persons found guilty of the identical conduct differently based on the breadth of the rehabilitation statutes in their respective states, when both persons were eligible for relief under their own state's law and both would have been had the state law been an exact counterpart of the federal Act." *Lujan–Armendariz,* 222 F.3d at 738 (explicating *Garberding*). The INS had argued that its differential treatment of persons obtaining expungements under exact counterparts of the FFOA and persons obtaining expungements under broader statutes was rational because "of the differing goals and results" that obtain under the FFOA as compared to more lenient state statutes. *Garberding,* 30 F.3d at 1190. We rejected this as a rational basis for differential treatment between similarly situated persons seeking to avoid deportation, regardless of whether the BIA's decision was consistent with congressional objectives. *See id.*[11] The Con-

11. Furthermore, our decision was in no way based upon the idea that the BIA could not

distinguish between particular expungement statutes thereby frustrating state sovereignty

stitution is concerned with the differential treatment of persons not statutes; the government's rationale that it was justified in refusing to give effect to state statutes reflecting different purposes than those of the FFOA did not provide a rational basis for the differential treatment of persons. Thus, *Garberding* established the rule that "persons who received the benefit of a state expungement law were not subject to deportation as long as they could have received the benefit of the federal Act if they had been prosecuted under federal law." *Lujan–Armendariz*, 222 F.3d at 738.

In *Paredes–Urrestarazu*, we recognized the converse rule that persons found guilty of a drug offense who could not have benefited from the FFOA were not entitled to receive favorable immigration treatment, even if they qualified for rehabilitation under state law. *See Paredes–Urrestarazu*, 36 F.3d at 812. Our result was driven by the same equal protection analysis. Petitioner in that case complained that the BIA erroneously affirmed the IJ's consideration of an expunged drug conviction during his deportation hearing; that conviction, however, did not meet the requirements for expungement under the FFOA. Had the petitioner been entitled to relief under the FFOA, his appeal would have had merit, since there would be no reason to reach different results due to "the mere fortuity that the state, and not the federal government, prosecutes an alien for a particular offense." *Id.* In short, "it would be 'anomalous' to give effect to the federal expungement statute while not giving effect to its state counterparts." *Lujan–Armendariz*, 222 F.3d at 738 (quoting *Paredes–Urrestarazu*, 36 F.3d at 812). However, because Paredes–Urrestarazu was not eligible for relief under the FFOA, he

could not receive the benefits of the state rehabilitation law for federal immigration purposes.

Finally, in *Lujan–Armendariz*, we considered whether the IIRIRA-amended definition of "conviction" nullified the effect of state rehabilitative statutes on drug possession offenses for immigration purposes. We concluded that because IIRIRA did not repeal (in whole or in part) the FFOA, equal protection principles mandated that aliens whose convictions had been expunged pursuant to state law were still entitled to the same treatment as those whose convictions had been expunged under federal law. Contrary to the INS's position, we clarified that *Garberding* and *Paredes–Urrestarazu* stand for the principle "that equal protection requires that the INS treat federal and state expungement statutes similarly." *Id.* at 743 n. 24. Most significantly, we reached this conclusion in spite of the factual distinction that *Garberding* involved disparate treatment under parallel state statutes, rather than federal and state statutes, because "it is evident that our reasoning in [those] case[s] applies equally in both contexts." *Id.*

 We conclude that the petitioner's case is controlled by our decisions in *Garberding*, *Paredes–Urrestarazu*, and *Lujan–Armendariz*. Together, these three cases stand for the broad proposition that absent a rational basis (and as long as the FFOA remains extant), the INS may not discriminate against aliens convicted of simple possession offenses whose subsequent conduct would have qualified them for FFOA rehabilitation, but for the fact that they were convicted and rehabilitated under the laws of another sovereign. Put another way, equal protection consider-

over the administration of state criminal law, since such a claim would be precluded by the

constitutional precept of federal supremacy. *See* U.S. Const. art. VI, cl. 2.

ations prohibit the government from treating differently aliens who have committed identical offenses and have had their convictions expunged, simply because of the origin of the statute under which they were lawfully rehabilitated.

## B.

We evaluate Dillingham's constitutional challenge according to the requirements of equal protection law. In order to succeed on his challenge, the petitioner must establish that his treatment differed from that of similarly situated persons. See Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (explaining that the guarantee of equal protection directs that "all persons similarly situated be treated alike"); see also United States v. Armstrong, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (denying criminal defendant's equal protection challenge to selective prosecution for drug offenses due to defendant's failure to establish that similarly situated persons of other races were not subjected to prosecution). Our prior cases dictate that persons similarly situated to petitioner for equal protection purposes are persons convicted of drug offenses based upon conduct for which they would have been eligible for relief under the FFOA, and whose convictions were ultimately expunged by the sovereign that imposed them.[12]

For this reason, we find that the Board's categorical decision not to recognize foreign expungements for simple drug possession offenses did indeed result in differential treatment between the petitioner and persons whose federal and state expungements of identical crimes were honored by the INS. The BIA erred when it found that "the expungement of [Dillingham]'s conviction is akin to a foreign pardon and is therefore ineffective for immigration purposes." Ignoring our prior equal protection decisions in Garberding, Paredes–Urrestarazu, and Lujan–Armendariz, the Board ruled that Dillingham failed to satisfy the fourth criterion of Manrique, because he was rehabilitated under a foreign (as opposed to a state) statute, and because as a general policy matter the Board has never recognized foreign pardons of crimes of moral turpitude. By likening foreign expungements of simple drug possession offenses to foreign pardons of crimes of moral turpitude—a category of crimes for which Congress has not enacted a domestic rehabilitation statute analogous to the FFOA—the Board improperly skirted the constitutional issue of differential treatment in this case.

Unfortunately, as a result of the Board's false comparison, we can glean little of use from its opinion. Virtually all of the cases on which the BIA relied concern foreign pardons of crimes of moral turpitude.[13]

12. Moreover, we agree with the dissenting member of the Board who noted that "Garberding ... in no way limits application of the principle which it establishes to state statutes that are analogues to the federal statute. .... Garberding relies upon an equal protection analysis under the United States Constitution and holds that the subsequent construction of a prior disposition of criminal conduct, and the resulting treatment of the individual in immigration proceedings, should be based on the conduct, not the provision under which

such conduct was adjudicated." Manrique, Int. Dec. 3250 at 20 (emphases original).

13. The one exception—Mullen–Cofee v. INS, 976 F.2d 1375 (11th Cir.1992)—involved convictions for drug possession for purposes of trafficking, not simple possession, and thus would not have been subject to FFOA rehabilitation either. Id. at 1377. The pardon in that case went unrecognized for immigration purposes because no pardons of drug offenses are recognized under the INA, whether foreign or domestic. Id. at 1379 n. 7; 8 U.S.C.

*See, e.g., Marino v. INS,* 537 F.2d 686 (2d Cir.1976); *Weedin v. Hempel,* 28 F.2d 603 (9th Cir.1928); *Matter of F–Y G–,* 4 I & N Dec. 717 (BIA 1952); *Matter of G–,* 5 I & N Dec. 129 (BIA 1953). It is unsurprising that courts have not found any problematic equal protection implications for aliens deported (or deemed inadmissible) for such crimes, given that they would not have qualified for expungment under an applicable federal statute anyway. *Cf. Carr v. INS,* 86 F.3d 949, 952 (9th Cir.1996) (holding that *Garberding* was of no help to an alien who was convicted of a firearms offense and subsequently ordered deported by the INS, because *Garberding* "did not speak to the issue of treating aliens differently on the basis of the crimes they had committed").

 Had the Board restricted itself to a discussion of the propriety of recognizing foreign expungements for first offender minor drug convictions, it would have been forced to acknowledge that such recognition in fact furthers the desired "objective of achieving greater uniformity in the administration of the immigration laws." *Paredes–Urrestarazu,* 36 F.3d at 815. In other words, such a policy arguably would aid the government to achieve its own expressed purpose of insulating aliens from the severely disproportionate punishment of deportation for simple possession drug offenses without requiring that it honor any grant of rehabilitation showing greater leniency than would have been

available under federal law. *Cf. Rehman v. INS,* 544 F.2d 71, 75 (2d Cir.1976) (reasoning that the INS ought to recognize a state expungement of marijuana possession because no "fear of undermining enforcement of federal deportation laws" can exist where such recognition "would extend no further than where Congress itself has gone for federal criminals"). The dissent dismisses this position, stating that foreign expungement laws have nothing to do with the uniformity of federal immigration laws. *See* Dissent at 13250. We add that neither do state expungement laws have anything facially to do with federal immigration laws. Indeed, it is only the differential treatment by the government of persons seeking to avoid deportation on the basis of the jurisdiction from which they received expungements for their past offenses that gives rise both to the problem of uniformity and to the constitutional issue of equal protection.

 Thus, having found differential treatment, we turn to the question of whether the Board's decision is supported by a rational basis. The government's chief contention is that its policy of not recognizing foreign expungements is justified because of the added administrative difficulty in verifying that an alien's conviction has indeed been validly expunged, and that he or she in fact complied with the requirements of the foreign expungement statute such that the alien also would have qualified for relief under the FFOA.[14] The

---

§ 1227(a)(2)(B). *But cf.* 8 U.S.C. § 1227(a)(2)(A)(v) (recognizing pardons of crimes of moral turpitude).

**14.** Judge Fernandez adopts the government's position in his dissent, and we certainly agree that concerns regarding verification, fraud, and corruption are serious. Nevertheless, we believe that they do not justify the government's blanket policy of refusing to recognize *all* such expungements through the adoption of an irrebuttable presumption. Ultimately,

the fact that the alien bears the burden of establishing the validity of an expungement, coupled with the government's need to identify and verify foreign convictions in order to determine deportability, reduces these concerns to a question of relative administrative burden. Judge Fernandez lists a parade of horribles that he believes may ensue as a result of our ruling today (for example, that we may soon be required to rule that an alien seeking to authenticate an expungement can-

Supreme Court has held, however, that in cases where the petitioner's interest is substantial and the government's interest in putting forth the policy in question is unquantifiable or de minimis, such a policy cannot withstand even rational basis review.

In *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court held that an Illinois policy of irrebuttably presuming that unmarried fathers were unfit to merit custody of their children lacked a rational basis, violated equal protection, and required the state to provide such fathers with a fitness hearing prior to making such a determination. In so doing, the Court rejected the state's claim that unmarried fathers are so seldom fit as parents that Illinois should not be required to "undergo the administrative inconvenience of inquiry." *Id.* at 656, 92 S.Ct. 1208. The Supreme Court specifically stated that the Due Process Clause was "designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." *Id.; see also Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775,

not be expected to obtain proper records from his country of origin). *Cf. Abovian v. INS,* 219 F.3d 972, 978 (9th Cir.2000) (ruling that "independent corroborative evidence is not required from asylum applicants where their testimony is unrefuted"); *Ramos–Vasquez v. INS,* 57 F.3d 857, 862 (9th Cir.1995) (stating that, in the absence of documentary evidence, an asylum applicant may satisfy the objective component of his claim for fear of persecution by giving testimony that is "credible, persuasive, and refers to specific facts that give rise to an inference that [he] has been or has a good reason to fear that he ... will be singled out for persecution").

In response, we simply point out that the broad range of authentication procedures available in immigration proceedings are available to both the government and aliens seeking to avoid deportation. *See Iran v. INS,* 656 F.3d 469, 472 n. 8 (9th Cir.1981) (stating that documentary evidence may be admitted in a deportation proceeding if authenticated under INS regulations, or otherwise in accordance with Rule 44 of the Federal Rules of Evidence or by "any procedure that comports with common law rules of evidence"). While the government is certainly required to authenticate a record of conviction in order to determine that it is genuine, *see Chung Young Chew v. Boyd,* 309 F.2d 857 (1962), such a record once authenticated will suffice to establish that the alien stands convicted of the recorded crime, barring evidence to the contrary, if there is an identity between the name of the alien and the name stated on the rec-

ord. *See Corona–Palomera v. INS,* 661 F.2d 814 (9th Cir.1981) (stating that for purposes of deportation "identity of names sufficiently links a document to a person") (citing *Pasterchik v. United States,* 400 F.2d 696, 701 (9th Cir.1968), *cert. denied,* 395 U.S. 982, 89 S.Ct. 2142, 23 L.Ed.2d 770 (1969) (regarding proof of a prior conviction to support ciminal charges of transportation of firearms by one convicted of a felony)). Despite the greater resources and lower opportunity costs of the INS as compared with almost any alien petitioner, the government itself is not required to provide special proofs of a document's trustworthiness. *See, e.g., Espinoza v. INS,* 45 F.3d 308 (ruling that "information on an authenticated immigration form is presumed to be reliable in the absence of evidence to the contrary" and that the IJ is not required to permit cross-examination of the form's preparer). Thus, given the relative ease with which the government can ordinarily establish proof of foreign conviction, it seems to this court wholly irrational that the BIA should adopt a rule that duly authenticated evidence of foreign expungement categorically cannot be considered in deportation proceedings.

In any event, the concerns regarding potential deportee malfeasance enumerated above are not presented by the facts of this case, which involve the expungement of a simple possession offense under a British law that presents no greater obstacles to obtaining proper evidence than cases involving state expungements.

13 L.Ed.2d 675 (1965). *But cf. Reno v. Flores*, 507 U.S. 292, 311–12, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (upholding the INS's policy of refusing to release alien juveniles who are awaiting deportation into the custody of adults who are not close blood relatives, but rejecting the contention that " 'minimizing administrative costs' is adequate justification for the Service's [policy]"). Moreover, we do not seek to impugn the intentions of the government here, but we find that the Court's reasoning in *Stanley* applies.

■ The private liberty interests involved in deportation proceedings are indisputably substantial. *See, e.g., INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("Deportation is always a harsh measure."); *Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) ("Here the liberty of an individual is at stake. . . . Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. . . . Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness."); *Yepes–Prado*, 10 F.3d at 1369 n. 11 ("Deportation is a drastic measure and at times the equivalent of banishment or exile. It is the forfeiture for misconduct of a residence in this country.") (quotation omitted).

■ Significantly, it is the alien who bears the burden of demonstrating that he or she is eligible for admission into the United States. The alien also bears the burden of demonstrating that he or she is eligible for adjustment of status.

The BIA would nonetheless establish, by way of its decision in this case, an irrebuttable presumption against the validity of all foreign expungements—irrespective of where the offense in question occurred; how comparable to ours the system of criminal justice (including the operation of the expungement law) may be;[15] and what degree of evidence verifying the expungement the alien may present. Today's ruling should in no way be interpreted as an impediment to the Board's future establishment of appropriate standards concerning these and other relevant criteria.

■ Thus, as the Court stated in *Stanley*, although "[p]rocedure by presumption is always cheaper and easier than individualized determination," 405 U.S. at 656–67, 92 S.Ct. 1208, we find that the government's interest in administrative convenience is insufficient to establish a rational basis for its categorical dismissal of foreign expungements. Indeed, we fail to see how the administrative burden of identifying and verifying foreign convictions (which the government already undertakes as a matter of course to determine whether an alien is admissible into the United States) is any different from the incremental burden of verifying foreign expungements—especially in light of the government's failure to provide any evidence in support of this claim in regard to the present case. We accordingly find the government's decision establishing an irrebuttable presumption against the validity of foreign expungements to be unacceptably overbroad, in light of an alien's substantial interest in avoiding deportation, as well as the government's minimal (or nonexistent) incremental burden in verifying that his or

---

**15.** Any assertion that the BIA is without the ability to make such a comparison is without merit, for, as the dissenting member of the Board noted in this case, the Board "ha[s] long considered foreign dispositions by looking to their federal analogues." *Manrique*, Int. Dec. 3325 at 20–21.

her conviction was expunged. Thus, we hold that the government's purported interest in administrative convenience does not constitute a legitimate basis for distinguishing aliens like Dillingham, whose illicit conduct and subsequent rehabilitation occurred on British soil (but who would otherwise have qualified for relief under the FFOA), from aliens whose convictions and expungements took place domestically under state procedures.

We continue to take heed of the fact that federal classifications distinguishing among aliens are subject to relaxed scrutiny, because of the plenary authority that the federal government holds over matters of immigration. *See Nyquist*, 432 U.S. at 7 n. 8, 97 S.Ct. 2120. However, we must clarify that this is no more true in the present case, where the petitioner has been subjected to differential treatment because his crime was prosecuted and expunged under foreign rather than state or federal law, than it has been in previous cases where the government drew a distinction between expungements granted under the laws of different states. Ultimately, for our purposes the fact that Dillingham's conviction took place on British soil prior to his arrival in this country and was expunged pursuant to a British rehabilitative statute amounts to a distinction without a difference. The equal protection rationale driving our controlling cases remains unaffected. Simply stated, under the facts of this case, there is no rational basis for precluding Dillingham from eligibility for adjustment of status, while permitting aliens convicted domestically of identical offenses (and rehabilitated under similar state and federal rehabilitative statutes) to seek such relief.

## V.

Finally, the BIA argues that *Chevron* deference should be accorded to its "rea-sonable" interpretation of the statutory language in 8 U.S.C. § 1182(a)(2)(A)(i)(II). *See Aguirre–Aguirre*, 526 U.S. at 415, 119 S.Ct. 1439. However, this argument is again foreclosed by *Lujan–Armendariz*. There, we rejected a similar claim that the Board's definition of the IIRIRA-amended term "conviction" should control. We held that because IIRIRA did not repeal (in whole or in part) the FFOA, the statute was not ambiguous and precluded the government's interpretation. As a result, *Chevron* deference was not warranted. *Lujan–Armendariz*, 222 F.3d at 748–49. Similar reasoning applies to this case, rendering the BIA's position meritless.

## Conclusion

In finding Dillingham statutorily ineligible for adjustment of status, the BIA failed to consider the central animating principle underlying our holdings in *Garberding, Paredes–Urrestarazu*, and *Lujan–Armendariz*. Properly understood, these holdings stand for the proposition that equal protection bars the government from discriminating against aliens who have committed substantially identical offenses and have had their convictions expunged under substantially identical statutes, solely because of where the offense occurred. The government's purported interest in administrative efficiency does not constitute a rational basis to justify such a distinction.

Because we hold that Dillingham no longer stands "convicted" of a controlled substance offense, we exercise jurisdiction over the merits of his petition and find him eligible to seek a discretionary grant of adjustment of status to legal permanent resident. We accordingly grant the petition and remand to the BIA for such a determination.

**PETITION GRANTED AND RE-MANDED.**

FERNANDEZ, Circuit Judge, Dissenting:

Dillingham argues that as a matter of constitutional law expungements in all of the countries of the world must be treated in the same manner as expungements within the United States because anything less would violate the principle of equal protection. I disagree.

While Congress could, no doubt, so decree, it is not compelled to do so by the Constitution. As in other equal protection claims, what we must ask is whether there was a rational basis for the choice made here. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976); *Madrid v. Gomez,* 190 F.3d 990, 996 (9th Cir.1999); *Cecelia Packing Corp. v. United States Dep't of Agric.,* 10 F.3d 616, 625 (9th Cir.1993). And in the immigration area, that is applied in an even more relaxed manner than usual. *See Nyquist v. Mauclet,* 432 U.S. 1, 7 n. 8, 97 S.Ct. 2120, 2124 n. 8, 53 L.Ed.2d 63 (1977). That is because federal authority in this area is plenary. *See Mendoza v. INS,* 16 F.3d 335, 338 (9th Cir.1994). "The reasons that preclude judicial review of political questions ... dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Mathews v. Diaz,* 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). We will only overturn a classification if it is "wholly irrational." *Id.* at 83, 96 S.Ct. at 1893.

I see nothing irrational in a determination that we will not treat aliens who obtain expungement of drug offenses in other countries in the same way that we treat those who obtain expungement of offenses in this country. Of course, under the Federal First Offender Act, 18 U.S.C. § 3607, some simple drug possession convictions can be expunged. When they are, they are not used as a predicate for deporta-

tion; the Attorney General has so decided. On equal protection grounds, we have extended that to expungements under state laws. *See Lujan–Armendariz v. INS,* 222 F.3d 728, 737–38 (9th Cir.2000); *Garberding v. INS,* 30 F.3d 1187, 1191 (9th Cir. 1994); *see also Paredes–Urrestarazu v. INS,* 36 F.3d 801, 811 (9th Cir.1994). One could question the idea that the Attorney General is required by the Constitution to treat state expungement statutes in the same way he treats the FFOA. *Garberding* itself did not say that, although it did decide that when the Attorney General determines that he will treat exact state counterparts of the FFOA in the way he treats the FFOA itself, he must then treat other state expungement statutes in a similar manner. Of course, for purposes of this case, that is neither here nor there.

As I see it, that is a far cry from stating that the Attorney General is equally required to treat the expungement statutes from all of the countries of the world in the same manner that he treats the FFOA and, by extension, state expungement statutes. It is no "mere fortuity" that foreign offenders are prosecuted in their own countries and not here. *See Paredes,* 36 F.3d at 812. Nor do foreign expungement laws have anything to do with " 'uniform nationwide application of [our] immigration laws.' " *Id.* (citation omitted). In fact, foreign countries and their ways are not necessarily, or even particularly, the same as this country and its ways. A much more complex task is placed upon the shoulders of an administrative agency when it is told that it must not only review the varying ways and means of expungements all over the world, but also the full records of aliens who have admittedly committed foreign offenses, not to mention the difficulties that can be encountered in authenticating the accuracy of those records.

Nor will it do to say that the burden will be on the alien. The next step in this process will most likely be a claim that the alien cannot be expected to get actual records from his country of origin. *See Abovian v. INS,* 219 F.3d 972, 978–79 (9th Cir.2000); *Ramos–Vasquez v. INS,* 57 F.3d 857, 862–63 (9th Cir.1995). And, even special authentication requirements for documents from other countries, where forgery may be rampant, are treated as suspect in this circuit. *See Khan v. INS,* 237 F.3d 1143, 1144 (9th Cir.2001). That is not to say that it will be impossible to administer a system which requires ranging all over the world in that manner—we know that just as people can live in virtually any environment, they can ultimately live with and administer just about any kind of system, no matter how difficult. But it is to say that it is perfectly rational to decline to undertake that process. The Attorney General does not have to take on the burden of dealing with the rules and records of every country in the world simply because, at root, he decided to ignore convictions expunged under the FFOA.

In fine, equal protection does not require the progression we have here: recognition of FFOA expungements, to recognition of similar state statutes, to recognition of all state statutes and, finally, to recognition of enactments all over the world. To say that, does not enisle this country, although it does recognize that we are a separate nation. One world is a fine concept, but it is not a constitutional imperative. Not yet anyway.

Thus, I respectfully dissent.