324 F.3d 1071
 BEAR LAKE WATCH, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
PACIFICORP; The States of Idaho, Utah And Wyoming; Bear River Water Users Association, Respondents-Intervenors.
 No. 02-70660.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 5, 2003.
 Filed March 27, 2003.
 
 Randall M. Weiner, Boulder, CO, for the petitioner.
 Lona T. Perry, Federal Energy Regulatory Commission, Washington, D.C., for the respondent.
 Thomas H. Nelson, Jeffrey S. Lovinger (argued), Thomas H. Nelson & Associates, Portland, OR, for the intervenor-respondent PacifiCorp.
 Harriet A. Hensley, Deputy Attorney General, Natural Resources Division, Boise, ID, for the intervenor-respondent the State of Idaho.
 Norman K. Johnson, Assistant Attorney General, Salt Lake City, UT, for the intervenor-respondent the State of Utah.
 Thomas J. Davidson, Deputy Attorney General, Water & Natural Resources Division, Cheyenne, WY, for the intervenor-respondent the State of Wyoming.
 Petition to Review a Decision of the Federal Energy Regulatory Commission. FERC No. UL97-11-002.
 Before O'SCANNLAIN, FERNANDEZ, and FISHER, Circuit Judges.
 OPINION
 FERNANDEZ, Circuit Judge:
 
 
 1
 The Federal Energy Regulatory Commission decided that because a reservoir was not necessary or appropriate to the operation of power projects, it did not have jurisdiction over that reservoir, even though it did have jurisdiction over the power projects themselves.[1] Bear Lake Watch, Inc. disagreed with that decision, and has petitioned for review of it. We deny the petition.
 
 BACKGROUND
 
 2
 In 1909, Telluride Power Company began action to develop Bear Lake as a reservoir, and in 1911 to 1912 it obtained the right to direct water from Bear River into the lake. Water is withdrawn from the river, and when needed downstream, it is pumped out of the lake at the Lifton Pump Station and returned to the river. Telluride undertook the project in order to store water for irrigation and power purposes.
 
 
 3
 Disputes later arose between Telluride's successors in interest and various other entities, which had a claim on Bear River water. Litigation, agreements, and an interstate compact followed. The result was that the rights of Telluride's successors to store and use the Bear River water at Bear Lake was recognized as long as that did not interfere with any senior users' rights. Pursuant to the interstate compact between Idaho, Utah and Wyoming, there must also be an irrigation reserve in Bear Lake for a reservoir level up to 5,914.6 feet, and water may not be released below that level for power generation alone. Although Bear Lake does have a maximum usable storage capacity of 1,420,000 acre feet, its operators[2] have targeted a level of 5,918 feet, which results in usable storage of 1,000,000 acre feet. That is seen as a level that will allow the meeting of irrigation needs without posing a flood risk.
 
 
 4
 The end result of all of this is that, whatever might have been Telluride's original intent, Bear Lake is now primarily used for irrigation and flood control purposes, with power generation being incidental. Of course, when water is released for irrigation purposes, it can generate power on its way to the irrigation canals, if power facilities stand between Bear Lake and the canals.
 
 
 5
 PacifiCorp does operate a number of facilities on the Bear River downstream from Bear Lake. Those are hydropower projects licensed by FERC. They include the following: (1) the 14 megawatt Soda Project, located 55 miles downstream of Bear Lake; (2) the 33 megawatt Grace Project, located 6 miles downstream of the Soda Project; (3) the 7.5 megawatt Cove Project, which takes advantage of the tailrace waters of the Grace Project's powerhouse; (4) the 30 megawatt Oneida Project, located 22 miles downstream of the Cove Project; and (5) the 30 megawatt Cutler Project, located about 44 miles downstream of the Oneida Project. Most of them do make use of water released for irrigation, but Cutler, which is furthest downstream, does not.
 
 
 6
 In FERC's view, the denouement of this story of activity by Telluride and its successors, including PacifiCorp, is that Bear Lake's regulation of the flow of water in the Bear River has made less water available for generation than there would have been if the Bear River had been left alone. In short, as FERC sees it, Telluride's victory over the river can be summed up in one word — Pyrrhic. Thus, FERC declined to take jurisdiction, and this appeal followed.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 7
 We have jurisdiction pursuant to 16 U.S.C. § 825l (b).
 
 
 8
 "Under the FPA [Federal Power Act], we grant conclusive effect to the Commission's findings of fact if such findings are supported by substantial evidence. Where, however, the petitioners call into question the Commission's understanding of its statutory mandate, our review is de novo." Am. Rivers v. FERC, 201 F.3d 1186, 1194 (9th Cir.1999) (internal citation omitted).
 
 
 9
 If Congress has "directly spoken to the precise question at issue" and its intent is clear, "that is the end of the matter." Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). However, if the statute being construed by the agency "is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782. In other words, we owe deference to an agency's reasonable interpretation of a statutory provision where Congress has left the question to the agency's discretion. See City of Seattle v. FERC, 923 F.2d 713, 715 (9th Cir.1991) (holding that we "`show great deference to [FERC's] interpretation of the law which it is charged with administering.'" (citation omitted)).
 
 DISCUSSION
 
 10
 Bear Lake Watch attacks FERC's decision on two fronts. It says that FERC applied both an improper legal analysis and an improper factual analysis when it eschewed jurisdiction in this case. We will discuss each of those in turn.
 
 A. FERC's Legal Analysis
 
 11
 We start, as we must, with the statute and with FERC's understanding of its meaning.
 
 FERC is empowered to, among other things:
 
 12
 issue licenses to citizens of the United States ... or to any corporation organized under the laws of the United States ... for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient ... for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction....
 
 
 13
 16 U.S.C. § 797(e) (emphasis added). As the emphasis shows, the statute directs regulation of reservoirs and other project works. In a magnificent exercise in periphrasis, the FPA then defines "project works" as "the physical structures of a project," and defines "project" as including, among other things, "all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of [a complete unit of improvement or development]." 16 U.S.C. § 796(11)-(12) (emphasis added).
 
 
 14
 Periphrasis aside, the sections use two slightly different locutions regarding FERC's authority. They refer to reservoirs which are "necessary or convenient"[3] and to reservoirs which are "necessary or appropriate"[4] to a power generating project. While "convenient" and "appropriate" are not exactly synonyms, if one rummages about in dictionaries, one finds that the words do overlap in some of their meanings, and one definition of "convenient" is "appropriate." See, e.g., Webster's Third New International Dictionary 497 (1986). At any rate, neither FERC nor Bear Lake Watch suggests that anything turns on the nuanced difference between the words in some other contexts. We will treat them as equivalent in this context and will hereafter use the single phrase "necessary or appropriate."
 
 
 15
 It is clear enough, then, that FERC must take jurisdiction over the operations of Bear Lake by PacifiCorp, if that facility is necessary or appropriate to the operation of PacifiCorp's hydropower facilities downstream. But Congress has not directly said what "necessary or appropriate" means. Its failure to do so means that it has left the complex policy decision about how far FERC should extend its regulatory tentacles up to FERC itself. See Navellier v. Sletten, 262 F.3d 923, 945 (9th Cir.2001) (authorization to grant exemptions when "`necessary or appropriate in the public interest ...' reflects the Congressional intent to entrust certain policy decisions to the SEC."). Put another way, it has left that decision to the discretion of the agency. See Concrete Tie of San Diego, Inc. v. Liberty Const., Inc., 107 F.3d 1368, 1371 (9th Cir.1997) ("The SBA need only award a contract `whenever it determines such action is necessary or appropriate' — a determination within the agency's discretion."). We, in turn, must respect that congressional choice, and must accord deference to FERC. See City of Seattle, 923 F.2d at 715; see also Dillingham v. INS, 267 F.3d 996, 1004 (9th Cir.2001).
 
 
 16
 What FERC has quite reasonably decided is that when a reservoir is located far away from a power generating facility — here at least 55 miles — it is not necessary or appropriate to that facility, if it does not provide any significant generating benefit. That seems to comport with common sense; how can a reservoir be necessary or appropriate to a hydroelectric plant, if its regulation of water does not confer a significant generation benefit upon that plant? It certainly makes little sense to say that it is necessary or appropriate when, as here, its effect on the flow of a river is to decrease the water otherwise available to the plant. As we have said in another context, "[t]he term `necessary' imposes only the minimal requirement that the expense be appropriate and helpful for the development of the ... business." Smith v. Comm'r, 300 F.3d 1023, 1029 (9th Cir.2002) (some internal quotation marks omitted); see also 9 to 5 Org. for Women Office Workers v. Bd. of Governors of Fed. Reserve Sys., 721 F.2d 1, 10 (1st Cir.1983). If something is not helpful to the business, and is even detrimental, it is not unreasonable to say that it is not necessary. Thus, FERC has ruled that when a reservoir, here Bear Lake, does not have a significant beneficial impact on power generation but, rather, has the opposite effect, it is not a necessary or appropriate part of the generation project. Again, we see nothing about that rule that would violate congressional intent. See Dillingham, 267 F.3d at 1004.
 
 
 17
 But, says Bear Lake Watch, we should accord less deference to FERC's decision because it conflicts with earlier FERC decisions. See Young v. Reno, 114 F.3d 879, 883 (9th Cir.1997). That is a worthy enough principle, but it does not apply here. In fact, FERC has previously looked to see if a dam or reservoir provided a "significant increase in generation" at a downstream power project. Georgia Pac. Corp., 91 FERC ¶ 61,047 at ¶ 61,172 (2000). When it did, FERC took jurisdiction. Id. And in another case decided before the one at hand, FERC outlined its position with even more clarity. In a proceeding before it, FERC was concerned with two reservoirs — Rest Lake Reservoir and Turtle-Flambeau Reservoir. Chippewa and Flambeau Improvement Co., 95 FERC ¶ 61,017, reh'g denied, 95 FERC ¶ 61,327 (2001). FERC stated that the operative principle was this:
 
 
 18
 [T]he Commission must examine the facts of each case, and fashion reasonable results based on the record. In the absence of other factors bearing on the question of "necessary or appropriate," we must make a common sense judgment whether the impact on generation of an upstream storage reservoir is such that it is part of a complete unit of development.
 
 
 19
 Id. at ¶ 61,036-37. FERC applied that principle and declared:
 
 
 20
 Rest Lake by itself increases generation by only 0.1 GWh, which amounts to approximately 0.06 percent of total downstream generation. We therefore concluded that Rest Lake is neither used and useful nor necessary or appropriate to maintain or operate the downstream projects. Accordingly, we ... concluded that we have no jurisdiction over this reservoir.
 
 
 21
 Id. at ¶ 61,035. But, as to Turtle-Flambeau, FERC said:
 
 
 22
 Given that that reservoir increases generation at the downstream projects by almost 9 GWh, which amounts to almost 6 percent of total downstream generation, we found that Turtle Flambeau Reservoir provides significant benefits to downstream licensed projects, and thus is part of the complete unit of development that includes those projects.
 
 
 23
 Id. FERC took jurisdiction over that reservoir.
 
 
 24
 Nor is Escondido Mut. Water Co.[5] to the contrary. There, the project in question had two hydroelectric generating stations which were operated as a part of the whole. FERC, and we, determined that even if the primary purpose of the project was something else, FERC could take jurisdiction. Id. at 1230. The project did not generate a lot of electricity, but we said that FERC could assume jurisdiction over it, even if the amount of power was not a significant part of the project as a whole. Id. We reserved judgment on the question of whether FERC could assume jurisdiction if the generating elements were so exceedingly slight as to constitute a sham. Id. at 1230-31. Thus, Escondido Mut. Water Co. dealt with a situation where the reservoir was part of the project itself, and at least some added electricity was generated on account of it. Here, of course, FERC decided that Bear Lake was situated very remotely from the actual projects, and that the contribution of Bear Lake was actually a negative one. That is not inconsistent with its earlier approach.[6]
 
 
 25
 In fine, FERC's legal approach does not bespeak an abuse of its discretion to determine what is necessary or appropriate.
 
 B. FERC's Factual Analysis
 
 26
 FERC conducted an analysis of records over a very long period and determined that Bear Lake reduced the output of electricity from the hydroelectric power plants in question below the output that would have been generated if Bear River had been allowed to run free. That is, Bear Lake actually had a negative effect upon the hydroelectric facilities, regardless of the initial hopes of Telluride. In reaching that conclusion, FERC compared the actual monthly flows of water at the plants with those that would have existed if Bear River had not been interfered with. Although water released for irrigation does generate power at certain of the hydroelectric projects and is in that sense beneficial at times, the overall operation of Bear Lake is detrimental to power generation at each and every one of the projects.
 
 
 27
 FERC's factual determinations cannot be set aside by us, if they were based upon substantial evidence. See Steamboaters v. FERC, 759 F.2d 1382, 1388 (9th Cir.1985). Here, as elsewhere, "[s]ubstantial evidence constitutes more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. If the evidence is susceptible of more than one rational interpretation, we must uphold [FERC's] findings." Eichler v. S.E.C., 757 F.2d 1066, 1069 (9th Cir.1985) (internal quotation marks and citations omitted); see also Atlanta-One, Inc. v. S.E.C., 100 F.3d 105, 107 (9th Cir.1996). We are not able to say that FERC's determinations were contrary to the evidence. As it said, the key question was "the actual impact of Bear Lake on downstream generating projects." PacifiCorp I, 97 FERC at 61,720. That impact was negative. Bear Lake Watch argues that FERC should only have concerned itself with the fact that Bear River water does reach the power projects via Bear Lake. It also argues that Telluride must have built the Bear Lake project for a reason. But, as FERC noted, those observations are essentially irrelevant. The real question is the effect, regardless of the original intentions. Moreover, the fact that Bear River water now comes via Bear Lake is not very interesting when the power plants would actually have had the use of even more water had Bear Lake never existed. The evidence supports those determinations.
 
 
 28
 At root, however, Bear Lake Watch is really attacking FERC's methodology. That attack fares no better, for we owe deference in that area also. As the Supreme Court has stated: "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). We have elaborated on that theme, and had this to say when a party attacked the methodology used by an agency:
 
 
 29
 We are in no position to resolve this dispute because we would have to decide that the views of Council's experts have "more merit than those of the [Forest Service's] experts." NEPA does not require that we decide whether an [EA] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology.
 
 
 30
 We defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential to a truly informed decision....
 
 
 31
 Inland Empire Pub. Lands Council v. Schultz, 992 F.2d 977, 981 (9th Cir.1993) (citations and some quotation marks omitted). And, again, in Greenpeace Action v. Franklin, 14 F.3d 1324 (9th Cir.1992), we pointed out that although a party:
 
 
 32
 has demonstrated that some scientists dispute the Service's analyses and conclusions, such a showing is not a sufficient basis for us to conclude that the Service's action was arbitrary or capricious. If it were, agencies could only act upon achieving a degree of certainty that is ultimately illusory.
 
 
 33
 Id. at 1336.
 
 
 34
 Bear Lake Watch complains that FERC should have sliced time into smaller segments and considered daily or even hourly flow data. But even if that were a more sophisticated approach, as opposed to a more cumbersome one, we are not able to say that FERC's approach was incorrect. Nor can we say that its response was arbitrary or capricious. As FERC put it "the losses in potential generation caused by Bear Lake operation are so consistent across such a broad range of conditions that any interstitial daily or hourly increases would clearly be dwarfed by corresponding decreases during other daily or hourly periods." PacifiCorp I, 97 FERC at ¶ 61,720 n.50.[7] We see no reason to fault that sensible scientific approach to the determination of the effect of Bear Lake on the generating possibilities of the Bear River.[8]
 
 CONCLUSION
 
 35
 FERC determined that, despite any plan of Telluride to direct Bear River water into Bear Lake in order to help generate hydroelectric power downstream, the fact is that the Bear Lake project actually decreases the downstream generation of power. In other words, Robert Burns' insight[9] is, once again, shown to have practical, as well as poetical, power. FERC did not err when it eschewed jurisdiction over the operations at Bear Lake.
 
 
 36
 Petition DENIED.
 
 
 
 Notes:
 
 
 [1]
 PacifiCorp, 97 FERC ¶ 61,161 (2001) (PacifiCorp I), reh'g denied, 98 FERC ¶ 61,117 (2002).
 
 
 [2]
 The current operator is PacifiCorp, which has been permitted to intervene in this appeal
 
 
 [3]
 16 U.S.C. § 797(e)
 
 
 [4]
 16 U.S.C. § 796(11)
 
 
 [5]
 Escondido Mut. Water Co. v. FERC, 692 F.2d 1223, 1230 (9th Cir.1982).
 
 
 [6]
 The same may be said ofGreat N. Paper, Inc., 88 FERC ¶ 61,042 (1999). There, a number of reservoirs were operated as one essentially integrated system, and, while none was very significant in itself, their effect was to aid in the generation of more, not less, power. If they had no, or negative, impact, FERC would not have taken jurisdiction. See id. at ¶ 61,161. Even though the commission had at times "found some reservoirs associated with a project to be jurisdictional and others not jurisdictional based on size differences," on the peculiar facts before it, FERC took jurisdiction over all of the reservoirs in question. Id. at ¶ 61,117. That, of course, is quite unlike the case at hand.
 
 
 [7]
 This also answers Bear Lake Watch's complaint that FERC did not consider the stabilization of electricity production wrought by Bear Lake's storage capacity. Again, the consistent losses caused by the operation of Bear Lake over a broad range of conditions served to demonstrate that stabilization is not a significant factor in this instance, although it may be in other instances
 
 
 [8]
 Two other matters are worth mentioning. First, Bear Lake Watch alludes to the possibility that use of the reservoir might have had a beneficial economic effect, even if it did not have a beneficial generation effect. However, that issue was not really briefed, although it was mentioned. Mention is not enoughSee Brookfield Communications, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1046 n. 7 (9th Cir.1999); In re Lowenschuss, 67 F.3d 1394, 1402 (9th Cir.1995); In re Alcock, 50 F.3d 1456, 1461 n. 9 (9th Cir.1995). Anyway, that is just another measurement methodology. Also, Bear Lake Watch asks us to consider an affidavit that was not in the administrative record. We decline to do so. We see no reason to deviate from the general rule that we do not consider evidence that "was never part of the administrative record." Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 760 n. 5 (9th Cir.1996). Moreover, the essential point about slicing time into smaller segments was, as we have noted, considered by FERC on the basis of the record before it.
 
 
 [9]
 "The best-laid schemes o' mice an' men / Gang aft agley." To a Mouse